PER CURIAM.
 

 Michael James Jackson seeks review of the judgments of conviction and sentences of death entered for the first-degree murders of Carol and James Sumner along with his concurrent sentences for two counts of robbery and two counts of kidnapping. Pursuant to our mandatory jurisdiction to review final judgments entered in capital proceedings, we affirm Jackson’s convictions and sentences.
 
 See
 
 art. V, § 3(b)(1), Fla. Const.
 

 FACTS AND PROCEDURAL HISTORY
 

 In July of 2005, Jackson and codefen-dants Tiffany Ann Cole, Bruce Kent Nixon, Jr., and Alan Lyndell Wade robbed, kidnapped, and murdered James and Carol Sumner.
 
 [1]
 
 The plan to rob and murder the Sumners evolved from knowledge Cole obtained about the couple from a prior relationship with them. Before moving to Florida, the Sumners had resided in South Carolina and Tiffany Cole became acquainted with them there. The Sumners had been neighbors of Cole’s family and had sold Cole a vehicle.
 

 Cole and Jackson were involved in a personal relationship and often traveled together. In June of 2005, this couple came to Florida to visit Alan Wade. During this visit, the Sumners allowed Cole and Jackson to stay with them in their Jacksonville home. During this initial visit, Jackson noticed that the couple was frail and would be easy victims. The Sum-ners were in them early sixties but in ill health which required a daily regimen of various prescription medications. Jackson informed Wade of the Sumners’ financial position, which included $90,000 from the sale of their South Carolina home and multiple television sets. Following the ini
 
 *1021
 
 tial visit, Jackson, Wade, and Cole began to develop a plan to rob the Sumners. Wade invited his best friend Bruce Nixon to join the scheme. At the time of the crimes, Wade and Nixon were eighteen years old, and Jackson and Cole were twenty-three years old.
 

 Bruce Nixon testified at trial after entering into a plea agreement.
 
 [2]
 
 He stated that the foursome planned the robbery together but Jackson was in charge. Jackson informed the eodefendants that he would “take care” of the Sumners by injecting them with a shot of medicine to cause their deaths. In preparation for the robbery, Nixon stole several shovels to dig a hole and Cole rented a Mazda from a rental agency in South Carolina to transport the group. After arriving in Florida, the foursome secretly watched the house for several days as they developed a strategy for the logistics of the robbery. Several days before the murders, Nixon assisted Jackson and Wade in digging a six-foot-deep hole in a remote area of Georgia. The group left the shovels at that location when the excavation was completed. In further preparation for the attack, Jackson, Cole, and Wade purchased gloves, duct tape, and plastic wrap to be used in securing the victims. A “toy gun” was also obtained. Video surveillance captured the group entering and leaving the store where the items were purchased, and receipts for the purchases were found in the motel room where Jackson, Cole, and Wade were eventually apprehended.
 

 On the evening of July 8, 2005, Nixon and Wade approached and knocked on the door of the Sumner residence. When Carol Sumner responded, Wade asked if he could use the telephone and Carol allowed Wade and Nixon to enter the house. Once inside, Wade ripped the telephone wire from the wall. The Sumners were held at “gunpoint” with the toy gun as Nixon and Wade bound them with the duct tape.
 

 While Nixon and Wade entered the Sumner residence, Cole and Jackson remained outside in the rented Mazda because the Sumners knew and could identify them from their previous visit. As the crime unfolded, the foursome communicated with NexteT phones which operated as two-way handheld transceivers. After the men inside the residence informed Jackson through the Nextel phone that the Sum-ners were restrained, Jackson entered the home and began searching for bank statements and automated-teller-machine (ATM) cards. The codefendants found and removed jewelry, a lockbox of rare coins, and documents which were in the house.
 

 While Jackson searched the house, Nixon and Wade forced the Sumners to the garage where they ordered the victims to climb into the trunk of the Sumners’ Lincoln Town Car. Nixon and Wade then drove the vehicle to a gas station and refueled as Jackson and Cole followed in the Mazda. The four then drove to the Georgia gravesite as the Sumners remained trapped in the trunk of the vehicle. The Lincoln was driven close to the hole which the group had previously prepared, while Cole remained with the Mazda at the edge of the road. When the codefendants opened the trunk, they discovered that the duct tape had released and the bindings were not secure. Jackson then ordered Nixon to tighten the bindings and Nixon complied. Nixon stated that Jackson had obtained the personal identification number for the ATM card of the victims which
 
 *1022
 
 Jackson verified through a telephone call to their bank.
 

 The Sumners, still alive and bound, were placed in the deep hole. Jackson admitted that he heard Carol Sumner moan while she was in the hole. Nixon asserted that he walked away from the open grave and left Jackson and Wade to bury the victims.
 
 [3]
 
 Once the hole was filled with dirt, the group placed the shovels in the trunk of the Sumners’ Lincoln and departed the Georgia site to return to Florida. After attempting to wipe the vehicle to remove any identifying information, the Lincoln was abandoned in Sanderson, Florida, which is located approximately twenty miles from the gravesite. The shovels used in the episode remained in the trunk.
 

 The next stop for the group was an ATM in Jacksonville from which Jackson withdrew a large sum of money. After distributing the money among the codefen-dants, the group retired to a motel for the night. Later that evening, Wade and Cole returned to the Sumner residence to retrieve a computer which they later pawned.
 

 The following day, Bruce Nixon separated from the group and returned to his home in Baker County, Florida. He attended a party there where he displayed a plastic bag filled with multicolored prescription medications. During the party, Nixon announced that he had buried people alive and killed them without expressly stating that he had been assisted by others.
 

 On July 10, 2005, Carol Sumner’s daughter reported to law enforcement that her parents were missing. The Jacksonville Sheriffs Office (JSO) responded to the Sumner residence the following day to investigate. The back door of the Sumner home was unlocked. Ingredients that appeared to be associated with preparation for a dinner were on the stove and dirty plates were in the kitchen. Carol’s shoe and surgical boot were discovered which was unusual because these items were necessary for Carol to walk. That same day a JSO officer spotted a Lincoln Town Car in Sanderson. A subsequent analysis of items found in the Lincoln revealed Jackson’s fingerprints on an unopened roll of plastic wrap.
 

 As the JSO continued to investigate the disappearance of the Sumners, Jackson continued to withdraw money from the Sumner bank account. Between July 9 and July 13, 2005, approximately $5,000 was removed from the bank account. Photo surveillance captured Jackson using the Sumner ATM card several times from July 9 to July 13. The rented Mazda could be seen in the background of some of the surveillance photos.
 

 When Jackson began to have difficulty accessing the account, he contacted the bank purporting to be James Sumner. The bank informed Jackson that the daily withdrawal limit for the account had been exceeded. Jackson then attempted to solicit assistance from the JSO in accessing the accounts. Continuing to pretend that he was James Sumner, Jackson explained to a member of the JSO that he had left town hurriedly with his wife to attend the funeral of her sister in Delaware. When the officer asked to speak to his wife, Tiffany Cole responded under the pretense of being a tired and ailing Carol Sumner.
 

 The JSO detective suspected that he was not actually speaking to the Sumners. Accordingly, he contacted a United States Marshal to assist the JSO in tracking the
 
 *1023
 
 cellular telephone used by the caller, who was later identified as Jackson. The cellular telephone had been used in the vicinity of the Sumner residence during the approximate time of the abduction. Using the rental car global positioning system, law enforcement determined that the Mazda was within blocks of the Sumner residence on the night of the murders. Based upon the ATM photos of the Mazda, South Carolina law enforcement were able to track Tiffany Cole to two motel rooms rented under her name in the Charleston, South Carolina, area.
 

 On July 14, 2005, law enforcement found Jackson, Cole, and Wade at the motel. The police obtained a search warrant for the motel rooms. Upon receiving the entry code for the safe located in the motel room from the management, the police opened the safe and discovered identification, credit cards, a checkbook, and papers belonging to the Sumners. Some paperwork and mail were also in the motel room. A key ring that belonged to the Sumners was discovered in Wade’s motel room. Law enforcement found and recovered the Sumner coin collection in the trunk of Cole’s vehicle.
 

 Cole, Jackson, and Wade were arrested. Jackson was interrogated by several detectives. Law enforcement discovered an ATM card in a trash can in the interrogation room which lacked an identifying personal name but had been issued by the Sumners’ bank. Jackson informed the detectives that he had knowledge of the location of the Sumners but that Wade and Nixon were responsible for kidnapping and burying the victims. Jackson claimed that the ATM card belonged to Wade’s mother and that Wade had convinced Jackson to make withdrawals from the account. Jackson admitted that he was at the gra-vesite and saw the Sumners placed in the hole while they were still alive.
 

 Bruce Nixon was also arrested and revealed the burial location of the Sumners to law enforcement. On July 16, 2005, the bodies were discovered four miles north of the Florida-Georgia border in Charlton County, Georgia. The medical examiner testified that death was caused by mechanical obstruction of the airways by dirt. In essence, they were buried alive and asphyxiated from the dirt particles smothering their airway passages. Once the dirt covered their heads, they would have fallen unconscious and died within three to five minutes.
 

 Items of mail addressed to the Sumners were recovered from the rented Mazda. Both the Lincoln and the Mazda contained sand particles on the seats and floorboards. At the gravesite, law enforcement recovered cigarette packs, shell casings, and empty beer cans.
 

 Jackson testified in his defense that the plan was limited to robbing the Sumners and did not involve murder. He stated that Wade and Nixon went into the home while Jackson and Cole waited outside. Wade and Nixon then drove off in the Sumners’ vehicle and Jackson followed. At that point, Jackson asserted that he had no knowledge that the Sumners were bound and in the trunk. Jackson’s version of the facts was that when they arrived in Georgia, Wade and Nixon directed Jackson and Cole where to park and asked Jackson to bring them a flashlight. Jackson thought they were abandoning the Lincoln but when he approached the codefendants he heard Carol Sumner moan. Jackson stated that he was surprised and questioned Wade and Nixon about their actions before returning to the Mazda where Cole waited. Jackson admitted that he impersonated James Sumner during telephone calls with the JSO. After deliberations, the jury returned guilty verdicts on all counts.
 

 
 *1024
 
 During the penalty-phase proceedings, Jackson was offered multiple opportunities to present mitigation evidence but he declined to do so. Instead, defense counsel proffered the mitigation evidence already prepared. The trial court conducted a colloquy and consequently found that Jackson knowingly, intelligently, and voluntarily waived his right to present mitigation evidence and also that he had been well informed by counsel of the potential ramifications of this waiver. After deliberation, the jury recommended death sentences for the murders of both victims by votes of eight to four.
 

 During the
 
 Spencer
 

 [4]
 

 hearing, the State presented victim-impact evidence and a video recording of the Sumners’ memorial service. Jackson refused to permit his counsel to present witnesses or introduce mental health and school records. Jackson apologized to the victims for their loss but stated that he could not show remorse for offenses that he did not commit. Jackson maintained that he did not plan or participate in the kidnappings or murders.
 

 The trial court found eight aggravating circumstances: (1) Jackson had been previously convicted of a felony and was on probation at the time of the murders; (2) Jackson had been previously convicted of another capital felony because the murders occurred contemporaneously; (3) the murders for which Jackson was to be sentenced were committed while Jackson was engaged in the felony of kidnapping; (4) the murders were especially heinous, atrocious, or cruel (HAC); (5) the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); (6) the murders were committed for financial gain; (7) the murders were committed to avoid or prevent a lawful arrest; and (8) the victims were particularly vulnerable due to advanced age or disability.
 

 The trial court considered mitigation evidence despite Jackson’s refusal to present this evidence during the penalty phase. The trial court noted that it gleaned mitigating evidence from the trial, the presen-tence investigation report (PSI), letters in support of Jackson, and the argument of counsel. The trial court found one statutory mitigating circumstance which was that Jackson was twenty-three years old at the time of the crimes, with the caveat that there was no evidence that Jackson’s age contributed to his participation in the murders (some weight). In addition, the trial court found three nonstatutory mitigating circumstances: (1) Jackson was amenable to rehabilitation and a productive life in prison (some weight); (2) Jackson’s mother was a substance abuser and his parents abandoned him to be raised by his grandmother (some weight); and (3) Jackson’s prior criminal record, although extensive, contained no acts of violence (some weight).
 

 The trial court concluded that the aggravating circumstances far outweighed the mitigating circumstances. Accordingly, the trial court imposed a sentence of death for each of the murders, concurrent sentences of fifteen years for the robberies, and life imprisonment for the kidnappings.
 

 ANALYSIS
 

 On appeal, Jackson presents nine issues.
 
 [5]
 
 We conclude that two of Jackson’s
 
 *1025
 
 issues do not require further elaboration because they are clearly without merit based on this Court’s precedent.
 
 [6]
 

 Sufficiency and Independent Act Doctrine
 
 [7]
 

 During trial, the theory of defense was that Jackson participated in the robberies, but the subsequent kidnappings and murders were the independent and unforeseen acts of his codefendants. After presenting evidence to support this theory, Jackson requested and received the independent-act jury instruction which allowed the jury to determine whether the kidnappings and murders were caused, or materially contributed to, by any of Jackson’s actions during the robbery, or were the result of the independent acts of his codefendants. The jury rejected the independent act defense and concluded that Jackson was guilty of the capital offenses; specifically, the jury found that the murders were premeditated
 
 and
 
 committed during the commission of a felony. The trial court denied both of Jackson’s scant motions for judgment of acquittal. On appeal, Jackson asserts that the trial court erred in this determination because the evidence is insufficient to support his convictions.
 

 We review the denial of a motion for judgment of acquittal
 
 de novo,
 
 with consideration for the type of evidence submitted. If the State presents direct evidence, which the State did here, the trial court’s determination will be affirmed if the record, viewed in the light most favorable to the State, contains competent, substantial evidence supporting each element of the offenses.
 
 See Walker v. State,
 
 957 So.2d 560, 577 (Fla.2007) (quoting
 
 Conde v. State,
 
 860 So.2d 930, 943 (Fla.2003)). The trial court should not grant a motion for judgment of acquittal “unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.”
 
 Lynch v. State,
 
 293 So.2d 44, 45 (Fla.1974).
 

 Generally, felons are “responsible for the acts of their co-felons.”
 
 Lovette
 
 
 *1026
 

 v. State,
 
 636 So.2d 1304, 1306 (Fla.1994). “As perpetrators of an underlying felony, co-felons are principals in any homicide committed to further ... the initial common criminal design.”
 
 Id.
 
 A principal is defined as follows:
 

 Whoever commits any criminal offense against the state ... or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.
 

 § 777.011, Fla. Stat. (2005). Whether a defendant knows of a criminal act ahead of time or physically participates in the crime, participation with another in a common criminal scheme renders the defendant guilty of all crimes committed in furtherance of that scheme.
 
 See Jacobs v. State,
 
 396 So.2d 713, 716 (Fla.1981).
 

 However, an independent act of a codefendant occurs when a person other than the defendant commits a crime (1) which the defendant did not intend to occur, (2) in which the defendant did not participate, and (3) which was outside of, and not a reasonably foreseeable consequence of, the common design or unlawful act contemplated by the defendant.
 
 See Ray v. State,
 
 755 So.2d 604, 609 (Fla.2000);
 
 see also
 
 Fla. Std. Jury Instr. (Crim.) 3.6(0- A defendant’s absence when the crime occurred does not establish, in and of itself, that the crime was an independent act of another.
 
 See id.
 
 The purpose of this doctrine is to exonerate the nonparticipant from acts committed by a co-felon that are beyond the scope of the original plan.
 
 See Parker v. State,
 
 458 So.2d 750, 752 (Fla.1984).
 

 The evidence supported the jury’s conclusion that Jackson was guilty of the murders and that the murders were not the independent act of his codefendants. Foremost, Jackson admitted that he was a willing perpetrator of the underlying felony (i.e., the robbery of the Sumners) that set in motion the kidnapping and murders. As a principal in the robbery, Jackson is responsible for his codefendants binding the Sumners with duct tape, leading them from their home, placing them in the trunk of their vehicle, and then driving them to a remote area in Georgia where a prearranged grave awaited them. Under these circumstances, it cannot be said that the kidnapping terminated prior to the death of the Sumners because liberty was never restored to the victims and they were never in a place of safety once the robbery commenced.
 
 See Stephens v. State,
 
 787 So.2d 747, 754 (Fla.2001). Accordingly, the kidnapping occurred during the course of the robbery and the murders were the culmination of the commission of the kidnapping.
 

 It is also important to note that there was evidence that Jackson planned the robbery and stated that he would murder the Sumners. The State presented surveillance footage of Jackson and his code-fendants purchasing rubber gloves, and pieces of rubber gloves were found in the trunk of the recovered Lincoln. During police questioning, Jackson admitted that he knew the grave had been prepared before the robberies occurred. There was also evidence that Jackson carried a flashlight to the burial site and that Jackson watched as Nixon and Wade covered the victims with dirt. Jackson informed law enforcement during questioning that he saw the Sumners alive while they were in the hole and that he could hear the Sum-ners moaning and “trying to get up” from inside the hole. Jackson did not attempt to prevent Nixon and Wade from covering
 
 *1027
 
 the Sumners with dirt, as Jackson admitted when he testified that he merely walked away from the grave. Although Jackson attempts to find comfort in the contention that walking away from the grave demonstrated that he did not participate in the murders, his presence at the gravesite and failure to summon help for the couple present a question within the province of the jury to decide whether he intended the murders.
 

 In addition, cellular phone records reflected that at the approximate date and time of the murders, a phone call was made from the cellular phone used by Jackson to the Sumners’ bank. The call was routed through a cellular phone tower that was designated to address calls placed by mobile phones used in the area of the gravesite. After the murders, Jackson used the Sumner ATM card even though he knew that the Sumners were dead. He even contacted the JSO and the bank pretending to be James Sumner in an attempt to reactivate access to the account through the card. This provides further support for the conclusion that the murders were not the independent acts of the codefen-dants because they were a foreseeable consequence of the common design of this entire criminal episode.
 

 After thoroughly reviewing the record, we conclude that the State presented competent, substantial evidence that Jackson was a principal in the robbery, which involved the kidnapping and murders, and that he fully participated in creating the circumstances that directly produced the victims’ deaths. Thus, we deny relief on this issue because the evidence is sufficient to support both murder convictions on either theory of first-degree murder as well as each of his remaining felony convictions. In addition, our independent review of the record pursuant to our obligation to determine whether sufficient evidence exists to uphold the convictions supports the same conclusion.
 
 See
 
 Fla. R.App. P. 9.142(a)(6).
 

 Suppression of the Evidence Discovered Inside the Motel Safe
 

 After locating Jackson in a South Carolina motel room, law enforcement obtained a warrant to search the fixed premises. The items sought in the search warrant included (1) any checkbooks, identification cards, bank statements, bank registers, or other documents or papers that related to the Sumners; (2) documents bearing certain names, and (3) any ATM receipt, sales receipt, or transaction record related to the Sumners’ ATM card. Law enforcement also obtained the master code to the motel safe. Inside the safe, the officers found the identification, credit cards, and paperwork related to these victims. Jackson contends that the trial court erred in denying his motion to suppress these items because an additional warrant was required to open the safe. The trial court determined that it would be reasonable to secure the items specified in the warrant in a safe and, therefore, the safe was properly encompassed within the scope of the warrant.
 

 “A trial court’s ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.”
 
 Rolling v. State,
 
 695 So.2d 278, 291 (Fla.1997) (citing
 
 McNamara v. State,
 
 357 So.2d 410, 412 (Fla.1978)). In reviewing a trial court’s ruling on a suppression motion, this Court conducts a two-step analysis in which we determine whether (1) competent, substantial evidence supports the trial court’s findings of historical fact; and (2) the trial court reached the correct legal conclusion.
 
 See
 
 
 *1028
 

 Thomas v. State,
 
 894 So.2d 126, 136 (Fla.2004) (citing
 
 Connor v. State,
 
 803 So.2d 598, 608 (Fla.2001)). Here, the issue was purely a question of law because the facts were undisputed.
 

 The privacy expectations associated with a motel room are similar to those afforded in the home, although the transient nature of the occupancy may diminish the extent of the privacy a person is entitled to reasonably expect.
 
 See State v. Rabb,
 
 920 So.2d 1175, 1185 (Fla. 4th DCA 2006) (citing
 
 United States v. Jackson,
 
 588 F.2d 1046, 1052 (5th Cir.1979)). During this occupancy, “motel rooms are legally imbued ‘with the sanctity of private dwellings, ordinarily afforded the most stringent Fourth Amendment protection.’ ”
 
 Green v. State,
 
 824 So.2d 311, 314 (Fla. 1st DCA 2002) (quoting
 
 United States v. Martinez-Fuerte,
 
 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976));
 
 see also Gilbert v. State,
 
 789 So.2d 426, 428 (Fla. 4th DCA 2001). However, a valid search warrant permits law enforcement to enter this protected space to search for specified items.
 

 Generally, the scope of a lawful search of fixed premises pursuant to a warrant extends to the entire area in which the object of the search may be found.
 
 See United States v. Ross,
 
 456 U.S. 798, 820-21, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). This includes the authority to search through any containers, even those that are locked, that would reasonably contain the items specified in the warrant.
 
 See id.; see also United States v. Snow,
 
 919 F.2d 1458, 1461 (10th Cir.1990) (“The locked safe was a likely source for the specified documents and could therefore be opened.”);
 
 United States v. O’Neill, 27
 
 F.Supp.2d 1121, 1135 (E.D.Wis.1998) (stating that a search warrant for firearms permitted search of locked safe as long as those items could possibly fit in the safe);
 
 Green v. State,
 
 676 N.E.2d 755, 759 (Ind.Ct.App.1996) (explaining that it was unnecessary to obtain a second warrant to search a safe located within a fixed premises). For instance, if a safe is unlocked, officers are unquestionably “permitted to open it to determine if it contain[s] any of the items particularized in the search warrant” without obtaining an additional warrant.
 
 Dotson v. Commonwealth,
 
 47 Va.App. 237, 623 S.E.2d 414, 419 (2005). In evaluating conduct pursuant to a valid search warrant, the fact that a container is locked does not create any greater expectation of privacy in its contents than the limited privacy expectation that exists in the rest of the premises.
 
 See United States v. Morris,
 
 647 F.2d 568, 573 (5th Cir.1981) (“It would be a different matter if the box had been in a geographic area not covered by the warrant or if the objects sought in the warrant were of a size that would not fit in the box.”);
 
 State v. Hansen,
 
 732 P.2d 127, 131 (Utah 1987) (“A legal search authorized by valid warrant cannot be thwarted by the experience of concealing the contraband in unusual places.”). Thus, the trial court correctly determined that a locked safe in a motel room may be opened if the items specified in the search warrant could reasonably be concealed inside that location.
 

 Here, the search warrant specifically authorized the officers to search the motel room for several classes of items and extended to a search of any associated area where these items could reasonably be located.
 
 See, e.g., State v. Weber,
 
 548 So.2d 846, 847 (Fla. 3d DCA 1989). All of the items specified in the search warrant, which included documents, bank cards, and receipts, could fit inside the safe and would logically and reasonably be secured in a safe. Therefore, it was reasonable for the officers to search inside the safe for these
 
 *1029
 
 items.
 
 Cf. Evans v. Commonwealth,
 
 116 S.W.3d 503, 507 (Ky.Ct.App.2003) (holding that a search warrant that specifically authorized the search of an apartment for cocaine and other drug paraphernalia included a safe within the apartment). “Stated differently, the officers were not searching for an elephant in a matchbox,” but rather were searching for sugar in a sugar bowl.
 
 Dotson,
 
 623 S.E.2d at 417. To require an additional search warrant to reach the contents of a safe located within the fixed premises of a motel room would frustrate every search warrant issued under these particular circumstances. Thus, the language of the search warrant clearly encompassed the motel room safe.
 

 Accordingly, the trial court’s denial of the motion to suppress the contents of the motel room safe is based on the correct legal conclusion that this safe was encompassed in the search warrant and that law enforcement was not required to obtain a second warrant to access the contents of the motel room safe. Therefore, we deny relief on this issue.
 

 Jailhouse Recordings
 

 While incarcerated in South Carolina, Jackson made a telephone call from the Charleston County Jail to his grandmother which was recorded. At the inception of the telephone call, an automated voice informed Jackson and his grandmother that the call would be “monitored or recorded.” This warning was repeated later in the conversation. South Carolina law enforcement provided a recording of the conversation to the JSO without requiring the JSO to obtain a warrant or certification that a warrant was unnecessary. Based on the deposition of a South Carolina detective who stated that Charleston County Jail policy generally required a warrant to obtain a recording of a telephone call made from the jail, Jackson filed a motion to suppress the recorded statements. However, Jackson did not present the testimony of the detective during the suppression hearing and relied solely on the statements in the deposition. Jackson also asserted that a South Carolina. statute required a warrant but was unable to locate the statute even after the trial court provided additional time for counsel to conduct research before the recording was presented to the jury. Thus, the trial court denied the motion because under Florida jail procedures, inmates receive notice that all phone conversations are recorded.
 

 “Where, as in this case, the law of a foreign forum is claimed to be disposi-tional, but is not pleaded to the trial court, the matter is to be determined by the law of this state and a presumption arises that the foreign law is the same as ours.”
 
 Mills v. Barker,
 
 664 So.2d 1054, 1058 (Fla. 2d DCA 1995) (citing
 
 Columbian Nat’l Life Ins. Co. v. Lanigan,
 
 154 Fla. 760, 19 So.2d 67, 70 (1944)). Both the Florida and South Carolina Constitutions protect the privacy rights of citizens from the unreasonable interception of communications and the protections afforded to wire, electronic, or oral communications are codified in each state’s wiretapping act.
 
 See
 
 ch. 934, Fla. Stat. (2005); S.C.Code Ann. § 17-30-10 (Supp.2007). In
 
 State v. Smith,
 
 641 So.2d 849 (Fla.1994), this Court analyzed the application of the Florida Security of Communications Act, chapter 934, Florida Statutes, which is essentially identical to the provisions of the South Carolina wiretapping act at issue here. We held that (1) there was no expectation of privacy in a police vehicle, and (2) the Florida wiretapping act does not protect a communication under these circumstances. In so holding, we stated:
 

 The Fourth Amendment right to privacy is measured by a two-part test: 1) the person must have a subjective ex
 
 *1030
 
 pectation of privacy; and 2) that expectation must be one that society recognizes as reasonable.
 
 Katz v. United States,
 
 389 U.S. 347, 360[, 88 S.Ct. 507, 19 L.Ed.2d 576] (1967) (Harlan, J., concurring) .... A prisoner’s right of privacy fails both prongs of the
 
 Katz
 
 test. First, a prisoner’s privacy interest is severely limited by the status of being a prisoner and by being in an area of confinement that “shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room.”
 
 Lanza v. New York,
 
 370 U.S. 139, 143[, 82 S.Ct. 1218, 8 L.Ed.2d 384] (1962). Second, “society would insist that the prisoner’s expectation of privacy always yield to what must be considered the paramount interest in institutional security.”
 
 Hudson v. Palmer,
 
 468 U.S. 517, 528[, 104 S.Ct. 3194, 82 L.Ed.2d 393] (1984). Thus, “the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.”
 
 Id.
 
 at 526[, 104 S.Ct. 3194].
 

 Smith,
 
 641 So.2d at 851 (parallel citations omitted).
 

 This Court further stated that the wiretapping act did not afford protection to conversations that occurred in the back of a police vehicle because the act required an oral communication to be “uttered by a person exhibiting an
 
 expectation that such communication is not subject to interception under circumstances justifying such expectation.” Smith,
 
 641 So.2d at 852 (some emphasis added) (quoting § 943.02(2), Fla. Stat. (1991)). The South Carolina law essentially employs the same definition.
 
 See
 
 S.C.Code Ann. § 17-30-15(2) (2005);
 
 cf
 
 § 934.02(2), Fla. Stat. (2005). Under both the Fourth Amendment and the Florida wiretapping act, a speaker must have an actual subjective expectation of privacy and our society must recognize that the expectation is reasonable for the oral conversation to be protected.
 
 See Smith,
 
 641 So.2d at 852. Thus, there is no reasonable expectation of privacy in a police vehicle or in a telephone communication from jail during which warnings are issued; therefore, any interception of conversations that occur there would not be prohibited by chapter 943.
 
 See id,.
 

 Under the circumstances of this case, Jackson was aware through repeated, automated warnings that the jail would record and monitor his communication. Thus, Jackson implicitly consented to the interception. Moreover, Jackson did not have a right to privacy in the recorded statements because (1) Jackson did not have a legitimate, reasonable expectation of privacy in a recorded phone call that was placed while incarcerated after receiving warning that the call was being recorded; and (2) the interest in institutional security allows jailhouse conversations to be monitored.
 
 Cf. Mosley v. State,
 
 34 Fla. L. Weekly S468, - So.3d -, 2009 WL 2045387 (Fla. July 16, 2009) (holding that defendant waived the spousal privilege because he did not have a reasonable expectation of privacy in a telephone conversation placed while incarcerated after receiving multiple warnings that the call would be monitored and recorded). Therefore, we affirm the trial court’s denial of the motion to suppress because, under these circumstances, the wiretapping statute does not afford Jackson protection from interception and his Fourth Amendment privacy rights were not violated.
 

 Admission of Solicitation of Cellmate for Aid in Escape Plan
 

 The trial court allowed the State to present testimony that Jackson solicited a cellmate’s assistance in planning an escape from his incarceration in Florida. On appeal, Jackson contends that this
 
 *1031
 
 evidence was improper character evidence of a collateral crime that was irrelevant and unduly prejudicial. Evidence of escape is probative of the defendant’s mental state at the time of the action but must be relevant to the charged crime.
 
 See Escobar v. State,
 
 699 So.2d 988, 995-96 (Fla.1997),
 
 abrogated on other grounds by Connor v. State,
 
 803 So.2d 598, 607-08 (Fla.2001);
 
 Straight v. State,
 
 397 So.2d 903, 908 (Fla.1981). This Court stated in
 
 Straight
 
 that “[w]hen a
 
 suspected person in any manner attempts to escape
 
 or evade a threatened prosecution by flight ...,
 
 such fact is admissible,
 
 being relevant to the consciousness of guilt which may be inferred from such circumstance.”
 
 Id.
 
 (emphasis supplied). Thus, the necessary inquiry to determine relevancy and materiality is whether the evidence establishes a sufficient, identifiable nexus between the escape plan and the crime for which the defendant is being tried.
 
 See Murray v. State,
 
 838 So.2d 1073, 1085 (Fla.2002).
 

 Here, the evidence was relevant to the crimes for which Jackson was on trial because he was incarcerated pursuant to a grand-jury indictment for these crimes and was attempting to escape before his pending prosecution on the capital offenses and related felonies. There were no other charges from which Jackson could have been attempting to escape other than this capital trial. The time delay between the commission of the murders and the escape attempt did not weaken its probative value because the primary factor prompting Jackson’s escape was the pending capital trial which Jackson admitted during his testimony when he discussed his attempt to procure both an alibi witness and his cellmate’s assistance to facilitate an escape.
 

 [ Ajfter I talked to the detectives, this is after I did this, everybody is telling me you’re going down for murder. You’re going to get the death penalty. I’m thinking, man, I’m going down for something I didn’t do.... [S]o
 
 I literally come up ivith a plan. I got to get out of here.
 

 (Emphasis supplied.) It is clear from Jackson’s testimony that the escape plan was prepared for Jackson to either circumvent the pending capital trial or, as Jackson testified, to have the opportunity to develop a defense unrestrained by incarceration. In addition, Jackson corroborated the testimony of the cellmate by admitting that he solicited the assistance of his cellmate to escape. From the moment Jackson was informed that he was implicated in these murders he was involved in plotting his escape. After learning that he was a suspect during a recorded telephone conversation, Jackson stated, “I’ve got to find ... an escape route or something.” Thus, we conclude that the trial court did not abuse its discretion by admitting this evidence because the factual circumstances established a sufficient, identifiable nexus between the escape plan and the crimes for which Jackson was being tried.
 

 Admission of Codefendant’s Alleged Statements
 

 After his arrest in South Carolina, JSO detectives questioned Jackson with regard to the disappearance of the Sum-ners. During this recorded interview, officers probed Jackson for his response to statements allegedly made by Tiffany Cole that revealed details of the criminal acts. The recording of this interview was presented to the jury without redacting these statements. Before the recording was presented to the jury, however, the trial court instructed the jury that the recording contained questions and statements that were made by law enforcement, the jury could not “speculate on the accuracy of the officer’s statements,” and the ques
 
 *1032
 
 tions and statements by the JSO were only to be considered “to establish the context of Mr. Jackson’s reactions and responses.” Jackson now contends that the trial court erred in admitting the entirety of the recorded police interrogation without requiring the State to redact those portions of the interrogation that referenced the statements allegedly made by Cole, thus violating his constitutional right to confront the witness against him.
 

 The Sixth Amendment’s Confrontation Clause guarantees that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” Amend. VI, U.S. Const. In
 
 Crawford v. Washington, 541
 
 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause prohibits out-of-court statements by a witness that are testimonial unless (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by a court.
 
 See
 
 541 U.S. at 53-54, 124 S.Ct. 1354. The
 
 Crawford
 
 Court articulated that the Confrontation Clause applies to “ ‘witnesses’ against the accused — in other words, those who ‘bear testimony.’ ‘Testimony,’ in turn, is typically ‘[a]
 
 solemn declaration or affirmation made for the purpose of establishing or proving some fact.’
 
 ” 541 U.S. at 51, 124 S.Ct. 1354 (quoting 2 Noah Webster,
 
 An American Dictionary of the English Language
 
 (1828)) (emphasis supplied).
 

 A codefendant’s formal statement to a police officer in the course of an interrogation is testimonial because it generates from an examination that is designed to produce an affirmation which establishes or proves a fact. However, there is no record evidence that Cole was interrogated by the JSO or any indication that Cole actually made the contested statements to law enforcement as an affirmation for the purpose of establishing some fact. The statements were not admitted to prove the truth of the matter asserted (i.e., that Cole drove Jackson to the Sumner residence and that Jackson called the JSO under the pretense of being James Sumner). Rather, the statements were used purely as provocation to observe Jackson’s reactions. Police misrepresentations as to statements made by others may be used to provoke a confession as long as the deception does not render a confession involuntary.
 
 See
 
 Escobar, 699 So.2d at 994.
 
 [8]
 
 Thus, Jackson’s right to confront the witness against him was not violated because the State did not introduce out-of-court testimonial statements by Cole and the jury was instructed that the content of the statements were only to be considered to establish the context of Jackson’s reactions and responses. Moreover, it would not have been feasible or practical to redact the disputed statements without rendering the admissible portions of Jackson’s responsive statements incomprehensible. Therefore, we conclude that the trial court did not abuse its discretion in admitting the recorded interview in its entirety.
 

 Even if the statements were erroneously admitted, any error would be harmless based on the admissions by Jackson to each of the criminal acts that Cole allegedly claimed he committed.
 
 Cf. Ferguson v. State,
 
 920 So.2d 838, 841 (Fla. 4th DCA 2006) (citing
 
 State v. DiGuilio, 491
 
 So.2d 1129, 1135 (Fla.1986)). Jackson
 
 *1033
 
 stated during both his police interrogation and his trial testimony that on the night of the murders Cole transported him in the rented Mazda to the Sumner residence. He also admitted that he called the JSO pretending to be James Sumner. Therefore, the acts discussed in Cole’s alleged statements were admitted and confirmed by Jackson himself during his trial testimony. Based on these admissions by Jackson, there is no reasonable possibility that the asserted error affected the verdict.
 
 See DiGuilio,
 
 491 So.2d at 1135.
 

 Failure to Present Mitigation Evidence to the Penalty-Phase Jury
 

 Jackson validly waived his right to present mitigation evidence to the penalty-phase jury.
 
 Cf. Ocha v. State,
 
 826 So.2d 956, 961 (Fla.2002) (stating that a capital defendant may waive the right to present mitigation evidence). On appeal, Jackson contends that his death sentences must be vacated because the trial court failed to comply with this Court’s decision in
 
 Muhammad v. State,
 
 782 So.2d 348 (Fla.2001), because it (1) did not provide an alternative means for the jury to be advised of the otherwise available mitigation evidence, and (2) informed the jury that their recommendation would be afforded great weight.
 

 Foremost,
 
 Muhammad
 
 does
 
 not
 
 require the trial court to independently provide mitigation evidence to the jury in circumstances where the defendant has only waived his right to present such evidence. As clarified by this Court in
 
 Brooks v. State,
 
 918 So.2d 181, 210 (Fla.2005), the trial court is not required to present mitigation evidence to the jury. When a defendant waives mitigation evidence,
 
 Muhammad
 
 simply requires the trial court to order the preparation of a PSI and also permits the trial court to call witnesses to present mitigation evidence to the extent that the PSI alerts the court of the existence of significant mitigation.
 
 See Brooks,
 
 918 So.2d at 210 (citing
 
 Muhammad,
 
 782 So.2d at 363-64). Here, the trial court fully complied with these requirements by ordering the preparation of a PSI. In addition, the sentencing order reflects that the trial court utilized the PSI when it considered the appropriate sentences to be imposed for the murders.
 
 [9]
 

 Muhammad
 
 is entirely distinguishable from the circumstances of the present case. In
 
 Muhammad,
 
 the defendant presented two related arguments that we considered jointly. First, Muhammad discharged his penalty-phase counsel and requested a waiver of an advisory jury recommendation during the sentencing proceedings which the trial court denied.
 
 See
 
 782 So.2d at 350. In addition, the trial court afforded great weight to the jury’s recommendation despite the fact that the jury was not advised of any mitigation evidence because Muhammad refused to present mitigation evidence during the penalty phase.
 
 See id.
 
 at 361-62. We vacated Muhammad’s death sentence because the trial court committed reversible error by assigning the advisory jury’s recommendation great weight “in light of Muhammad’s refusal to present mitigating evidence and the failure of the trial court to provide for an alternative means for the jury to be advised of available mitigating evidence.”
 
 Id.
 
 at 361-62. By doing so, the trial court failed to “lessen its reliance on the jury’s verdict” when the lack of presentation of mitigation evidence hindered the ability of the jury to “fulfill its statutory role in sentencing in any meaningful way” and therefore less
 
 *1034
 
 ened the dispositive weight of the recommendation.
 
 Id.
 
 at 362.
 

 In contrast, Jackson never sought to waive the penalty-phase jury; rather, he simply declined to present mitigation evidence, thereby tacitly agreeing to a jury recommendation. In addition, Muhammad discharged his penalty-phase counsel and, as a result, “the jury heard only the State’s evidence and argument as to why the death penalty should be imposed.”
 
 Id.
 
 at 350. Conversely, in this case, defense counsel offered a closing statement to the jury which included assertions that (1) co-defendant Nixon evaded the death penalty when he cooperated with the police, (2) Jackson’s criminal history prior to the murders was limited to nonviolent crimes, and (3) Jackson was unaware of any plan to kill the Sumners. Thus, although Jackson did not offer any character and background mitigation, his counsel did
 
 not
 
 completely fail to offer mitigation matters for the jury’s consideration.
 

 Finally, although the trial court orally informed the jury that its recommendation would be given great weight, there is no indication here that the trial court afforded great weight to the jury’s advisory recommendation. In
 
 Muhammad,
 
 the sentencing order specifically provided, “This Court must give
 
 great weight
 
 to the jury’s sentencing recommendation.” 782 So.2d at 362 (some emphasis omitted). However, here, the trial court merely noted the eight-to-four jury recommendations and then stated:
 
 “Having conducted a separate analysis
 
 of the aggravating circumstances
 
 and such mitigating circumstance as are present in this cause,
 
 the Court concludes that the aggravating circumstances far outweigh the mitigating circumstances, and that death is the appropriate penalty.” (Emphasis supplied.) Thus, the trial court expressly conducted a separate analysis and did not consider the jury’s recommendation as dispositive of the ultimate sentence.
 
 Cf. Brooks,
 
 918 So.2d at 210 (rejecting a
 
 Muhammad
 
 challenge where the sentencing order did not reference the weight accorded to the jury recommendation and the order demonstrated that the “trial court properly viewed the jury’s recommendation”);
 
 Grim v. State,
 
 841 So.2d 455, 461 (Fla.2003).
 

 Accordingly, we deny relief on this issue because the trial court here complied with the dictates of
 
 Muhammad
 
 when a PSI was ordered and properly conducted an independent analysis of the aggravating and mitigating circumstances found in the record to determine the appropriate sentences without affording dispositive weight to the jury’s advisory recommendation.
 

 Proportionality
 

 Jackson contends that his death sentences are disproportionate because the circumstances reflect that this case is not one of the least mitigated capital cases. We perform a comparative proportionality review to prevent the imposition of “unusual” punishments contrary to article I, section 17 of the Florida Constitution.
 
 See Tillman v. State,
 
 591 So.2d 167, 169 (Fla.1991). This review is not a mere quantitative “comparison between the number of aggravating and mitigating circumstances.”
 
 Sexton v. State,
 
 775 So.2d 923, 935 (Fla.2000) (quoting
 
 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990)). Instead, it is a qualitative assessment that ensures that the death sentence is reserved for those murders that fall “within the category of both
 
 the most aggravated
 
 and
 
 the least mitigated
 
 of murders, thereby assuring uniformity in the application of the sentence.”
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003) (emphasis supplied) (citations omitted). After considering the totality of the circumstances and comparing the present case with other cases that contain similar aggravating and
 
 *1035
 
 mitigating circumstances, we determine that Jackson’s death sentences are proportionate.
 
 Cf. Salazar v. State,
 
 991 So.2d 364, 379 (Fla.2008),
 
 cert. denied,
 
 - U.S. -, 129 S.Ct. 1347, 173 L.Ed.2d 614 (2009).
 

 Jackson has not contested the eight aggravating circumstances found by the trial court, which included two of the most serious aggravators (i.e., HAC and CCP).
 
 [10]
 
 Although the trial court concluded that the following mitigation was only arguably shown by the record, it found one statutory and three nonstatutory mitigating circumstances.
 
 [11]
 
 After independently weighing the aggravating and mitigating circumstances against each other, the trial court found that “the weight of the aggravating circumstances far outweighs the weight of the mitigating circumstances and that death is the appropriate penalty.”
 

 Looney v. State,
 
 803 So.2d 656, 662-63 (Fla.2001), involved comparable circumstances in which the defendant entered the home of the victims, stole property, bound and gagged the victims with duct tape, shot them, and then ignited a fire inside the house. The trial court sentenced Looney to death after concluding that the five aggravating circumstances outweighed the six mitigating circumstances. The aggravating circumstances were: (1) Looney was previously convicted of a felony involving the use or threat of violence to a person; (2) the capital felony was committed while Looney was engaged in the commission of a burglary, arson, and robbery, and the crime was committed for financial or pecuniary gain (merged); (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (4) HAC; and (5) CCP.
 
 See id.
 
 at 664. As to statutory mitigation, the trial court gave moderate weight to Looney’s age of twenty years old and marginal-to-significant weight to the five nonstatutory mitigating circumstances.
 
 See id.
 
 This Court determined that when compared to other similar cases, the death sentences were proportionate.
 
 See id.
 
 at 682-83.
 

 Both of these double murder cases, (i.e.,
 
 Jackson
 
 and
 
 Looney)
 
 share the serious HAC and CCP aggravating circumstances balanced against the single statutory mitigating circumstance of age. Neither case contains statutory mental health mitigation. As to nonstatutory mitigation, both cases involve the defendant’s difficult childhood, amenability to life in prison, and lack of significant violent criminal history. In comparison, however, this case contains weaker mitigation and more aggravating circumstances. Furthermore, the circumstances of the murders in
 
 Looney
 
 did not extend over a period of time as that experienced by the victims here, where the
 
 *1036
 
 victims were buried alive. Therefore,
 
 Looney
 
 and other capital cases indicate that the death sentences imposed here are proportionate to the circumstances of the capital offenses.
 
 See also Frances v. State,
 
 970 So.2d 806, 820-21 (Fla.2007),
 
 cert. denied,
 
 - U.S. -, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008);
 
 Lugo v. State,
 
 845 So.2d 74, 117-19 (Fla.2003);
 
 Lynch v. State,
 
 841 So.2d 362, 374-77 (Fla.2003). Accordingly, based on a comparison of this case with the above decisions, we conclude that Jackson’s death sentences are proportionate punishment for his capital offenses.
 

 CONCLUSION
 

 For the reasons expressed above, we affirm Jackson’s convictions and sentences.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . Of the foursome, Jackson was tried first and subsequently convicted on all counts. Cole and Wade were also convicted and sentenced to death for the murders.
 

 [2]
 

 . Nixon pleaded guilty to lesser charges and received concurrent sentences of forty-five years’ imprisonment on each count.
 

 [3]
 

 . The evidence conflicted as to which of the codefendants actually carried out the burial. Nixon implicated Wade and Jackson; however, Jackson contested his involvement and testified that either Wade or Nixon effectuated the burial.
 

 [4]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [5]
 

 . Jackson presents the following issues: (1) whether the trial court erred in denying Jackson's motion for judgment of acquittal; (2) whether the trial court erred in failing to suppress evidence found in a locked safe inside a South Carolina motel room; (3) whether the trial court erred in failing to suppress recordings of telephone calls made by Jackson while he was incarcerated in South Car
 
 *1025
 
 olina; (4) whether the trial court erred in admitting evidence that Jackson solicited his cellmate to assist him in escaping from jail; (5) whether the trial court erred in introducing the out-of-court statements of a non-testifying codefendant in violation of Jackson's confrontation rights; (6) whether the trial court erroneously gave great weight to the jury's recommendation without providing an alternative means for the jury to be advised of the available mitigation evidence; (7) whether this Court's comparative proportionality review is unconstitutional; (8) whether Jackson's death sentences are disproportionate; and (9) whether Florida's capital-sentencing scheme violates due process, the Sixth Amendment, and
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 

 [6]
 

 . For the reasons already addressed in
 
 Hunter v. State,
 
 8 So.3d 1052 (Fla.2008),
 
 cert. denied,
 
 - U.S. -, 129 S.Ct. 2005, 173 L.Ed.2d 1101 (2009), we summarily deny issues seven and nine without additional analysis.
 
 See
 
 8 So.3d at 1072-76 (rejecting broad challenges to the manner in which this Court conducts its comparative proportionality review and to the constitutionality of Florida's capital-sentencing scheme);
 
 see also Mosley v. State,
 
 34 Fla. L. Weekly S468, - So.3d -, 2009 WL 2045387 (Fla. July 16, 2009). In addition, Jackson was convicted of a prior violent felony (i.e., the contemporaneous murders of the Summers); thus his assertions under issue nine are further without merit.
 
 See Frances v. State,
 
 970 So.2d 806, 822-23 (Fla.2007) (rejecting application of
 
 Ring
 
 when the death sentence was supported by the pri- or-violent-felony aggravating circumstance based on contemporaneous convictions of murder),
 
 cert.
 
 denied, - U.S. -, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008).
 

 [7]
 

 . Jackson's challenge to the trial court's denial of the judgment of acquittal requires us to consider the sufficiency of the evidence supporting his convictions, which we are required to independently determine upon direct review of all capital cases.
 
 See
 
 Fla. R.App. P. 9.142(a)(6).
 

 [8]
 

 . Jackson docs not assert that his confession was involuntarily induced by police deception.
 

 [9]
 

 . During the penalty phase and the
 
 Spencer
 
 hearing, the trial court also asked defense counsel to detail what evidence would have been offered in mitigation had Jackson permitted its introduction.
 

 [10]
 

 . The trial court found the following aggravating circumstances: (1) Jackson was previously convicted of a felony and was on probation at the time of the murders; (2) Jackson was previously convicted of another capital felony (i.e., the contemporaneous murder of the other victim); (3) the murders were committed while Jackson was engaged in the crime of kidnapping; (4) HAC; (5) CCP; (6) the murders were committed for pecuniary/financial gain; (7) the murders were committed to avoid or prevent a lawful arrest; and (8) the victims were particularly vulnerable due to advanced age or disability.
 

 [11]
 

 . The mitigating circumstances were that: (1) Jackson was twenty-three years old at the time of the crimes; (2) Jackson is amenable to rehabilitation and a productive life in prison; (3) Jackson’s mother was a substance abuser, and his parents abandoned him to be raised by his grandmother; and (4) Jackson’s prior criminal record, although extensive, contained no acts of violence.