# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

No. 1D17-3453
_____

TRAVIS R. BROWN,

   Appellant,

   v.

STATE OF FLORIDA,

   Appellee.

_____

On appeal from the Circuit Court for Hamilton County.
David W. Fina, Judge.

August 22, 2019

PER CURIAM.

   Indicted for first-degree murder, Travis Brown was convicted of the lesser-included offense of second-degree murder and sentenced to life imprisonment. On appeal, he argues that evidence of a collateral crime was erroneously admitted, as well as evidence that could negatively affect his counsel's credibility. Brown does not demonstrate error, so we affirm.

# I. Facts

The State filed a notice of its intent to offer *Williams*[1] Rule evidence of a shooting that occurred less than a month before the murder. The notice stated that Brown had already been convicted on five felony charges for shooting toward a vehicle in May 2015. This evidence was relevant to the June 2015 murder because experts concluded that the eight shell casings fired from Brown's gun in May were fired from the same gun as the bullets that killed the victim. Because there were no eyewitnesses to the murder, this evidence was particularly probative of the identity of the killer. Brown's motion in limine argued that evidence of this prior crime would only be used to show a propensity for criminal activity, was unfairly prejudicial, and could become a feature of the trial.

At a pretrial hearing on the *Williams* Rule evidence, the State noted that its eyewitness to the collateral-crime shooting was unavailable, but the parties agreed to proceed and continue the hearing only if the trial court could not make a sufficient finding of the earlier crime. The State's witnesses testified that the eyewitness identified Brown as the shooter, that Brown was known to carry a .45 caliber handgun, and that the shell casings recovered from the May shooting and June murder were fired from the same gun. The State then introduced, without objection, Brown's judgment and sentence following his guilty plea for the felonies he committed in the collateral crime. The trial court ruled that the *Williams* Rule evidence would be admissible, finding that there was clear and convincing evidence that shell casings from both shootings were fired from the same gun, Brown entered a guilty plea to the collateral-crime shooting charges and was identified as the shooter, the evidence was relevant for identity purposes, and the probative value of the evidence outweighed its prejudicial effect.

---

[1] *Williams v. State*, 110 So. 2d 654 (Fla. 1959); *see also* § 90.404(2)(a), Fla. Stat. (allowing the admission of evidence "of other crimes, wrongs, or acts" when "relevant to prove a material fact in issue" such as "identity").

Days before trial, Brown filed another motion in limine, asserting that he had a pending motion to withdraw his guilty plea in the collateral case, his guilty plea could no longer be used in his murder trial, and without the guilty plea there was no longer clear and convincing evidence to admit the *Williams* Rule evidence. Brown's attached post-sentencing motion to withdraw plea[2] asserted, *inter alia*, that the State coerced him into pleading guilty by offering him such a good deal that it overbore his will, precluding him from thinking rationally and realizing that his guilty plea would directly link him to a murder. The trial court denied this second motion in limine, stating that it had previously found clear and convincing evidence of the crime, although the judgment and sentence would not be admitted into evidence at trial.

At trial, witnesses testified that they found the victim shot and dying on a road at approximately 4:30 a.m. and, just before dying, he stated that he was shot by a man named "Slim" who drove a dark Cadillac. Officers developed Brown, who goes by "Slim," as a suspect and found the victim's debit card and Brown's DNA inside a dark Cadillac owned by Brown's girlfriend Kalandra Perry. A mutual friend testified that Brown routinely sold drugs to the victim, who often owed Brown money, and Brown sometimes would take the victim to the bank to withdraw money. In the hours before the victim's death, he was seen in an ATM video with another individual attempting to withdraw money, but was unsuccessful because a pending deposit had not yet gone through. In the same time frame, approximately seventeen phone calls were made from Brown's phone to Wells Fargo, and both Brown's and the victim's voices were identified on these calls. Brown's phone was tracked traveling in one direction from 4:00-4:25 (minutes before the victim was found on the road) before returning the way it came. Around the time of death, several more calls were made from Brown's phone to Perry's. After being brought to the police station, Brown was recorded on a phone call telling someone that he had deleted the

---

[2] *See* Fla. R. Crim. P. 3.170(*l*); Fla. R. App. P. 9.140(b)(2)(A)(ii)a.-e. (restricting the grounds a defendant may assert to withdraw a guilty plea post-sentencing).

contents of his phone and a subsequent search of the phone showed that this was true. Lastly, the State presented the *Williams* Rule evidence: the collateral eyewitness identified Brown as the person she saw shooting at a vehicle in May and experts testified that the gun used in May was the same gun that killed the victim.

After the State rested, Brown called Perry to testify on his behalf. Perry testified that Brown was in her bed the night of the murder and that the shooter in the May incident was not Brown, but Brown's brother. On cross-examination, Perry conceded that she had an interview with the State just weeks ago and had stated that she did not know where Brown or her Cadillac were at the time of the murder, and identified Brown as the shooter in the May shooting. At trial, Perry stated that all of her recent interview statements were lies and she only made them because she felt she was being framed for murder, the prosecutors threatened her, and she was mad at Brown for cheating on her. Perry also invoked her Fifth Amendment right against self-incrimination, told the trial court that she was being entrapped with perjury, and warned the prosecutor that he was "play[ing] a dangerous game" by cross-examining her about her inconsistent statements.

The State called Ryan Nydam, who had recently interviewed Perry, as a rebuttal witness and introduced the audio recording of his interview. Brown's counsel reviewed a transcript of the interview and found a portion where Perry discussed a conversation he had with her, and requested its redaction because it could create an issue with him becoming a witness. The trial court denied the request, finding nothing improper in Perry's statement and that it was relevant to show an inconsistency with her trial testimony. Counsel then argued that a portion pertaining to him could affect his credibility and the jury might infer that he asked Perry to lie for Brown. The trial court declined to require redaction, finding the statements relevant and inconsistent with Perry's testimony. During the recorded interview, Perry stated that she had received a handwritten letter from Brown asking her to tell his counsel that he was with her the night of the murder, but the two were not together that night nor the entire week. Perry became suspicious

4

that Brown committed the murder because she did not know why she needed to lie for him if he was innocent. Perry also said that she witnessed Brown shooting his gun during the incident in May. Regarding Brown's counsel, Perry stated that he informed her of the seventeen phone calls made from Brown's phone to Wells Fargo and repeatedly asked her if she was with Brown when he made these calls, although she repeatedly said that she was not. Nydam also testified that he interviewed Brown, who "was all over the place" in explaining where he was the night of the murder, giving Perry's house as one of several locations.

Craig Riley, a special agent with the Florida Department of Law Enforcement, testified that he interviewed Perry on two occasions shortly after the murder. On both occasions, Perry stated that she was at her mother's house on the night and week of the murder and not with Brown. Perry's mother also testified that her daughter spent the entire week of the murder with her and Brown was not there.

Brown recalled Perry, who testified that she gave false statements in her recorded interview because, just before it began, a police officer, prosecutor, and investigator told her that they would give her leniency in her own criminal cases if Brown was convicted.

## II. Analysis

### *Williams* Rule Evidence

"[E]vidence of any facts relevant to a material fact in issue except where the sole relevancy is character or propensity of the accused is admissible unless precluded by some specific exception or rule of exclusion." *Williams v. State*, 110 So. 2d 654, 663 (Fla. 1959); *see also* § 90.404(2)(a), Fla. Stat. (codifying the *Williams* Rule). Before allowing *Williams* Rule evidence, "the trial court must find that the prior acts were proved by clear and convincing evidence." *McLean v. State*, 934 So. 2d 1248, 1262 (Fla. 2006); *see also Harrelson v. State*, 146 So. 3d 171, 174-75 (Fla. 1st DCA 2014) (reversing after the trial court declined to make a finding on clear and convincing evidence).

At the *Williams* Rule hearing, the trial court found clear and convincing evidence that Brown was the shooter in the May incident and that this evidence would be admissible as it was particularly probative of identity. Brown does not argue that this finding was improper, the evidence was unfairly prejudicial, or that the *Williams* Rule evidence became a feature of the trial.

Instead, Brown argues that the trial court erred in not holding a second hearing on the *Williams* Rule evidence once he informed the court that he had a pending motion to withdraw his plea in the collateral case. Because the trial court did not do this, he argues, the remaining evidence—excluding the judgment and sentence—such as the hearsay evidence of the eyewitness and testimony of officers and experts, was not legally sufficient to admit the evidence. Brown's argument is premised on the belief that the trial court could not legally consider the judgment and sentence in the collateral case merely because he filed a motion to withdraw his guilty plea. Brown asserts this argument in a conclusory fashion without providing any legal basis and presumably requesting that we create such a rule. We decline to do so.[3]

### Redaction of the Alibi Witness's Interview

Brown claims error as to two portions of Perry's recorded interview, used to impeach her testimony on his behalf, that the trial court refused to redact. The trial court found that both statements were admissible and inconsistent with Perry's trial testimony. *See* § 90.608, Fla. Stat. ("Any party . . . may attack the

---

[3] *See Goodwin v. State*, 751 So. 2d 537, 544 (Fla. 1999) ("[T]he defendant bears the burden of demonstrating that an error occurred in the trial court, which was preserved by proper objection."); § 924.051(7), Fla. Stat. ("[T]he party challenging the judgment or order of the trial court has the burden of demonstrating that a prejudicial error occurred in the trial court.").

credibility of a witness by: (1) Introducing statements of the witness which are inconsistent with the witness's present testimony. . . ."). A trial court's ruling on whether to redact certain disputed statements from a recorded interview is reviewed for abuse of discretion. *See Jackson v. State*, 18 So. 3d 1016, 1032 (Fla. 2009).

In the first statement, Perry expressed her suspicion of Brown after Brown's counsel informed her of the phone calls Brown made and his location the night of the murder:

> [Nydam]: Did you have anything to make you believe that [Brown did it] or is it just because of his words?
> [Perry]: Just because of what he said. Because the reason why is because when his lawyer came and said, he told me, he said your cell phone pings or however y'all do it to find a person's cell phone. He said it was coming in Hamilton County area around that time so if you tell me to say that I went to Ham[ilton] Co[unty] late midnight, if you didn't do this, why is your cell phone supposedly coming 17 times going to Wells Fargo bank where the guy banked at. So I just been thinking about all that stuff. And a lot of stuff I didn't know until [Brown's counsel] came up here.

We find no issue in the fact that Perry revealed that she had spoken to her boyfriend's counsel about her case, do not find that he became a secondhand "witness," and note that all evidence discussed (Brown's location and calls to Wells Fargo) was already admitted into evidence. We similarly reject Brown's argument that the trial court erred in admitting Perry's opinions regarding Brown's possible guilt, *see Martinez v. State*, 761 So. 2d 1074, 1079 (Fla. 2000) ("[A] witness's opinion as to the guilt or innocence of the accused is not admissible."), as these statements were made by *his own alibi witness* and were appropriate for impeachment.

In the second statement, Perry reflected on Brown asking her to provide an alibi in his letter and her conversation with Brown's counsel about the alibi Brown had professed:

Sounded like to me he done convinced his lawyer to believe that, too, because when his lawyer came to talk to me, he kept saying, so you wasn't there when he was on the phone? I said, no, sir. No, sir. Are you sure? I said, yes, sir, I am sure. He asked me over and he asked me over and he asked me over. So, obviously, whatever story Travis is telling his lawyer is what he is trying to get me to say but his lawyer didn't want to say it out front. He wanted me to come out and say it and I wasn't going for that.

Brown's brief argument on appeal asserts that it is impermissible to challenge the credibility or character of a defense attorney. Brown cites only cases concerning a prosecutor's improper remarks about a defense attorney,[4] although the remarks here were made by his girlfriend and alibi witness. Brown was fully aware of Perry's interview before trial and, if he still decided to call her to testify, the State was permitted to impeach her credibility. We find that the trial court did not abuse its discretion in permitting Perry's statement that squarely contradicts her trial testimony.

### III. Conclusion

Despite a lack of any eyewitnesses, the State provided ample evidence incriminating Brown in the murder. *Williams* Rule evidence was ruled admissible and would be critical evidence of the killer's identity, and Brown's motion to withdraw his plea in his collateral case did not require a second pretrial hearing. Brown's only defense witness provided an alibi, but was extensively and permissibly impeached by the State without trial court error. We affirm Brown's judgment and sentence.

AFFIRMED.

RAY, C.J., and B.L. THOMAS and WINOKUR, JJ., concur.

---

[4] *E.g.*, *Merck v. State*, 975 So. 2d 1054, 1064 (Fla. 2007); *Mora v. State*, 211 So. 3d 308, 309 (Fla. 3d DCA 2017); *Redish v. State*, 525 So. 2d 928, 931 (Fla. 1st DCA 1988).

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____


Joseph S. Hamrick, Rick A. Sichta, and Susanne K. Sichta, The Sichta Firm, LLC, Jacksonville, for Appellant.

Ashley Moody, Attorney General, and Sharon S. Traxler, Assistant Attorney General, Tallahassee, for Appellee.