PER CURIAM.
Michael James Jackson seeks review of an order of the circuit court denying his motion to vacate his judgment of convictions and sentences of death filed under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habe-as corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.
BACKGROUND
Trial Court Proceedings
A jury convicted Michael James Jackson for the first-degree murders of Carol and James (“Reggie”) Sumner along with two counts of robbery and two counts of kidnapping. Jackson v. State, 18 So.3d 1016, 1020 (Fla.2009). The jury recommended death by a vote of eight to four for the murders of both victims. Id. at 1024. The trial court sentenced Jackson to concurrent sentences of death for both murders, to life for the kidnappings, and to fifteen years for the robberies. Id. at 1020. In the opinion affirming all convictions and sentences, this Court detailed the following facts with regard to Jackson’s crimes:
In July of 2005, Jackson and codefen-dants Tiffany Ann Cole, Bruce Kent Nixon, Jr., and Alan Lyndell Wade robbed, kidnapped, and murdered James and Carol Sumner. Cn-1] The plan to rob and murder the Sumners evolved from knowledge Cole obtained about the couple from a prior relationship with them. Before moving to Florida, the Sumners had resided in South Carolina and Tiffany Cole became acquainted with them there. The Sumners had been neighbors of Cole’s family and had sold Cole a vehicle.
[n.1] of the foursome, Jackson was tried first and subsequently convicted on all counts. Cole and Wade were also convicted and sentenced to death for the murders.
Cole and Jackson were involved in a personal relationship and often traveled together. In June of 2005, this couple came to Florida to visit Alan Wade. During this visit, the Sumners allowed Cole and Jackson to stay with them in their Jacksonville home. During this initial visit, Jackson noticed that the couple was frail and would be easy victims. The Sumners were in their early sixties but in ill health which required a daily regimen of various prescription medications. Jackson informed Wade of the Sumners’ financial position, which included $90,000 from the sale of their South Carolina home and multiple television sets. Following the initial visit, Jackson, Wade, and Cole began to develop a plan to rob the Sumners. Wade invited his best friend Bruce Nixon to join the scheme. At the time of the crimes, Wade and Nixon were eighteen years old, and Jackson and Cole were twenty-three years old.
Bruce Nixon testified at trial after entering into a plea agreement.1”-21 He stated that the foursome planned the robbery together but Jackson was in charge. Jackson informed the codefen-dants that he would “take care” of the Sumners by injecting them with a shot *452 of medicine to cause their deaths. In preparation for the robbery, Nixon stole several shovels to dig a hole and Cole rented a Mazda from a rental agency in South Carolina to transport the group. After arriving in Florida, the foursome secretly watched the house for several days as they developed a strategy for the logistics of the robbery. Several days before the murders, Nixon assisted Jackson and Wade in digging a six-foot-deep hole in a remote area of Georgia. The group left the shovels at that location when the excavation was completed. In further preparation for the attack, Jackson, Cole, and Wade purchased gloves, duct tape, and plastic wrap to be used in securing the victims. A “toy gun” was also obtained. Video surveillance captured the group entering and leaving the store where the items were purchased, and receipts for the purchases were found in the motel room where Jackson, Cole, and Wade were eventually apprehended.
[N.2] Nixon pleaded guilty to lesser charges and received concurrent sentences of forty-five years’ imprisonment on each count.
On the evening of July 8, 2005, Nixon and Wade approached and knocked on the door of the Sumner residence. When Carol Sumner responded, Wade asked if he could use the telephone and Carol allowed Wade and Nixon to enter the house. Once inside, Wade ripped the telephone wire from the wall. The Sumners were held at “gunpoint” with the toy gun as Nixon and Wade bound them with the duct tape.
While Nixon and Wade entered the Sumner residence, Cole and Jackson remained outside in the rented Mazda because the Sumners knew and could identify them from their previous visit. As the crime unfolded, the foursome communicated with Nextel phones which operated as two-way handheld transceivers. After the men inside the residence informed Jackson through the Nextel phone that the Sumners were restrained, Jackson entered the home and began searching for bank statements and automated-teller-machine (ATM) cards. The codefendants found and removed jewelry, a lockbox of rare coins, and documents which were in the house.
While Jackson searched the house, Nixon and Wade forced the Sumners to the garage where they ordered the victims to climb into the trunk of the Sum-ners’ Lincoln Town Car. Nixon and Wade then drove the vehicle to a gas station and refueled as Jackson and Cole followed in the Mazda. The four then drove to the Georgia gravesite as the Sumners remained trapped in the trunk of the vehicle. The Lincoln was driven close to the hole which the group had previously prepared, while Cole remained with the Mazda at the edge of the road. When the codefendants opened the trunk, they discovered that the duct tape had released and the bindings were not secure. Jackson then ordered Nixon to tighten the bindings and Nixon complied. Nixon stated that Jackson had obtained the personal identification number for the ATM card of the victims which Jackson verified through a telephone call to their bank.
The Sumners, still alive and bound, were placed in the deep hole. Jackson admitted that he heard Carol Sumner moan while she was in the hole. Nixon asserted that he walked away from the open grave and left Jackson and Wade to bury the victims.[n-3] Once the hole was filled with dirt, the group placed the shovels in the trunk of the Sumners’ Lincoln and departed the Georgia site to return to Florida. After attempting to wipe the vehicle to remove any identifying information, the Lincoln was aban *453 doned in Sanderson, Florida, which is located approximately twenty miles from the gravesite. The shovels used in the episode remained in the trunk.
[N.3] ipjjg evidence conflicted as to which of the codefendants actually carried out the burial. Nixon implicated Wade and Jackson; however, Jackson contested his involvement and testified that either Wade or Nixon effectuated the burial.
The next stop for the group was an ATM in Jacksonville from which Jackson withdrew a large sum of money. After distributing the money among the codefendants, the group retired to a motel for the night. Later that evening, Wade and Cole returned to the Sumner residence to retrieve a computer which they later pawned.
The following day, Bruce Nixon separated from the group and returned to his home in Baker County, Florida. He attended a party there where he displayed a plastic bag filled with multicolored prescription medications. During the party, Nixon announced that he had buried people alive and killed them without expressly stating that he had been assisted by others.
On July 10, 2005, Carol Sumner’s daughter reported to law enforcement that her parents were missing. The Jacksonville Sheriffs Office (JSO) responded to the Sumner residence the following day to investigate. The back door of the Sumner home was unlocked. Ingredients that appeared to be associated with preparation for a dinner were on the stove and dirty plates were in the kitchen. Carol’s shoe and surgical boot were discovered which was unusual because these items were necessary for Carol to walk. That same day a JSO officer spotted a Lincoln Town Car in Sanderson. A subsequent analysis of items found in the Lincoln revealed Jackson’s fingerprints on an unopened roll of plastic wrap.
As the JSO continued to investigate the disappearance of the Sumners, Jackson continued to withdraw money from the Sumner bank account. Between July 9 and July 13, 2005, approximately $5,000 was removed from the bank account. Photo surveillance captured Jackson using the Sumner ATM card several times from July 9 to July 13. The rented Mazda could be seen in the background of some of the surveillance photos.
When Jackson began to have difficulty accessing the account, he contacted the bank purporting to be James Sumner. The bank informed Jackson that the daily withdrawal limit for the account had been exceeded. Jackson then attempted to solicit assistance from the JSO in accessing the accounts. Continuing to pretend that he was James Sumner, Jackson explained to a member of the JSO that he had left town hurriedly with his wife to attend the funeral of her sister in Delaware. When the officer asked to speak to his wife, Tiffany Cole responded under the pretense of being a tired and ailing Carol Sumner.
The JSO detective suspected that he was not actually speaking to the Sum-ners. Accordingly, he contacted a United States Marshal to assist the JSO in tracking the cellular telephone used by the caller, who was later identified as Jackson. The cellular telephone had been used in the vicinity of the Sumner residence during the approximate time of the abduction. Using the rental car global positioning system, law enforcement determined that the Mazda was within blocks of the Sumner residence on the night of the murders. Based upon the ATM photos of the Mazda, *454 South Carolina law enforcement were able to track Tiffany Cole to two motel rooms rented under her name in the Charleston, South Carolina, area.
On July 14, 2005, law enforcement found Jackson, Cole, and Wade at the motel. The police obtained a search warrant for the motel rooms. Upon receiving the entry code for the safe located in the motel room from the management, the police opened the safe and discovered identification, credit cards, a checkbook, and papers belonging to the Sumners. Some paperwork and mail were also in the motel room. A key ring that belonged to the Sumners was discovered in Wade’s motel room. Law enforcement found and recovered the Sumner coin collection in the trunk of Cole’s vehicle.
Cole, Jackson, and Wade were arrested. Jackson was interrogated by several detectives. Law enforcement discovered an ATM card in a trash can in the interrogation room which lacked an identifying personal name but had been issued by the Sumners’ bank. Jackson informed the detectives that he had knowledge of the location of the Sum-ners but that Wade and Nixon were responsible for kidnapping and burying the victims. Jackson claimed that the ATM card belonged to Wade’s mother and that Wade had convinced Jackson to make withdrawals from the account. Jackson admitted that he was at the gravesite and saw the Sumners placed in the hole while they were still alive.
Bruce Nixon was also arrested and revealed the burial location of the Sum-ners to law enforcement. On July 16, 2005, the bodies were discovered four miles north of the Florida-Georgia border in Charlton County, Georgia. The medical examiner testified that death was caused by mechanical obstruction of the airways by dirt. In essence, they were buried alive and asphyxiated from the dirt particles smothering their airway passages. Once the dirt covered their heads, they would have fallen unconscious and died within three to five minutes.
Items of mail addressed to the Sum-ners were recovered from the rented Mazda. Both the Lincoln and the Mazda contained sand particles on the seats and floorboards. At the gravesite, law enforcement recovered cigarette packs, shell casings, and empty beer cans.
Jackson testified in his defense that the plan was limited to robbing the Sum-ners and did not involve murder. He stated that Wade and Nixon went into the home while Jackson and Cole waited outside. Wade and Nixon then drove off in the Sumners’ vehicle and Jackson followed. At that point, Jackson asserted that he had no knowledge that the Sum-ners were bound and in the trunk. Jackson’s version of the facts was that when they arrived in Georgia, Wade and Nixon directed Jackson and Cole where to park and asked Jackson to bring them a flashlight. Jackson thought they were abandoning the Lincoln but when he approached the codefendants he heard Carol Sumner moan. Jackson stated that he was surprised and questioned Wade and Nixon about their actions before returning to the Mazda where Cole waited. Jackson admitted that he impersonated James Sumner during telephone calls with the JSO. After deliberations, the jury returned guilty verdicts on all counts.
During the penalty-phase proceedings, Jackson was offered multiple opportunities to present mitigation evidence but he declined to do so. Instead, defense counsel proffered the mitigation evidence already prepared. The trial court conducted a colloquy and consequently *455 found that Jackson knowingly, intelligently, and voluntarily waived his right to present mitigation evidence and also that he had been well informed by counsel of the potential ramifications of this waiver. After deliberation, the jury recommended death sentences for the murders of both victims by votes of eight to four.
During the Spencer [n-4] hearing, the State presented victim-impact evidence and a video recording of the Sumners’ memorial service. Jackson refused to permit his counsel to present witnesses or introduce mental health and school records. Jackson apologized to the victims for their loss but stated that he could not show remorse for offenses that he did not commit. Jackson maintained that he did not plan or participate in the kidnappings or murders.
[N-4] Spencer v. State, 615 So.2d 688 (Fla. 1993).
The trial court found eight aggravating circumstances: (1) Jackson had been previously convicted of a felony and was on probation at the time of the murders; (2) Jackson had been previously convicted of another capital felony because the murders occurred contemporaneously; (B) the murders for which Jackson was to be sentenced were committed while Jackson was engaged in the felony of kidnapping; (4) the murders were especially heinous, atrocious,, or cruel (HAC); (5) the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); (6) the murders were committed for financial gain; (7) the murders were committed to avoid or prevent a lawful arrest; and (8) the victims were particularly vulnerable due to advanced age or disability-
The trial court considered mitigation evidence despite Jackson’s refusal to present this evidence during the penalty phase. The trial court noted that it gleaned mitigating evidence from the trial, the presentence investigation report (PSI), letters in support of Jackson, and the argument of counsel. The trial court found one statutory mitigating circumstance which was that Jackson was twenty-three years old at the time of the crimes, with the caveat that there was no evidence that Jackson’s age contributed to his participation in the murders (some weight). In addition, the trial court found three nonstatutory mitigating circumstances: (1) Jackson was amenable to rehabilitation and a productive life in prison (some weight); (2) Jackson’s mother was a substance abuser and his parents abandoned him to be raised by his grandmother (some weight); and (3) Jackson’s prior criminal record, although extensive, contained no acts of violence (some weight).
The trial court concluded that the aggravating circumstances far outweighed the mitigating circumstances. Accordingly, the trial court imposed a sentence of death for each of the murders, concurrent sentences of fifteen years for the robberies, and life imprisonment for the kidnappings.
Jackson, 18 So.3d at 1020-24.
Direct Appeal
On direct appeal, Jackson asserted that the trial court erred: (1) in denying Jackson’s motion for judgment of acquittal; (2) in failing to suppress evidence found in a locked safe inside a South Carolina motel room; (3) in failing to suppress recordings of Jackson’s telephone calls while he was incarcerated in South Carolina; (4) in admitting evidence that Jackson solicited his cellmate to assist him in escaping from jail; (5) in allowing admissions of out-of-court *456 statements of a non-testifying co-defendant in violation of Jackson’s confrontation rights; and (6) in giving great weight to the jury’s recommendation without providing an alternative means for the jury to be advised of the available mitigation evidence. He also argued that (7) this Court’s comparative proportionality review is unconstitutional; (8) his death sentences are disproportionate; and (9) Florida’s capital sentencing scheme violates due process, the Sixth Amendment, and Ring v. Arizona, 586 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Jackson, 18 So.3d at 1024 n. 5. This Court denied relief on all claims and affirmed the convictions and sentences of death. Id. at 1036. Jackson filed a petition for certiorari review in the United States Supreme Court, which was denied on January 19, 2010. Jackson v. Florida, 558 U.S. 1151, 130 S.Ct. 1144, 175 L.Ed.2d 979 (2010).
Postconviction Proceedings
On April 25, 2011, Jackson filed an initial motion for postconviction relief. He filed “Defendant’s Amended, Rule 3.851(e)(1) Initial Motion for Postconviction Relief’ on August 16, 2011. The motion presented claims that defense counsel was ineffective for: (1) failure to engage in any pre-trial, victim outreach activities in an attempt to open channels of communication between Jackson’s counsel and the victims’ family members and friends; (2) failure to prepare an adequate motion to suppress Jackson’s recorded jail telephone conversations; (3) failure to object to argumentative and speculative witness questions from the prosecution, and answers to those questions by Detective James Rowan and co-conspirator Bruce Nixon; (4) failure to object to improper victim impact statements that included victim “grief’ and “memorial” evidence during the penalty phase of Jackson’s trial; and that (5) the cumulative errors of defense counsel constitute ineffective assistance of counsel. He also claimed that the Florida law under which Jackson was sentenced to death was declared unconstitutional in Evans v. McNeil, No. 08-14402-CIV, 2011 WL 9717450 (S.D.Fla. June 20, 2011).
Jackson requested an evidentiary hearing on all claims except claim six. On August 10, 2011, the postconviction court held a case management conference/Hujf[1] hearing and granted an evidentiary hearing on claims one and three. The postcon-vietion court determined that the rest of the claims could be decided as a matter of law.
Waiver of Guilt-Related Issues
In accordance with Jackson’s instructions, his amended motion for postconviction relief did not include any guilt phase issues. Jackson wrote at least two letters to the trial court in which he waived all guilt-related issues. In one letter he wrote, among other statements:
I’ve asked my attorney Mr. Christopher Anderson to do the right thing and allow me to tell the truth. It is my hope that he will not try to hinder that in any way.... As you are aware I’ve dropped all guilt phase challenges, for I am indeed guilty. Sir, all I seek is to tell the truth and your mercy.
In another letter, Jackson wrote, among other statements:
CI feel there is much that has been miscommunicated.... Yes, sir, I do hope to be able to tell the truth about what happened in this case. I’ve lied so much about everything and so has everyone else....
Secondly, my attorney Mr. Anderson seems to think that my agenda in seeking to tell the truth has something to do *457 with “Religion.” While yes, I have been saved, and yes the Conviction to tell the truth does stem from the Spirit and the desire to obey God; I assure that I will respect the law of your Courtroom and the State of Florida. I will keep all my testimony within the Scope of the case.... The body of the 3.851 ... is improper, and if addressed in its present form would be pursuing a lie. Yes, I’ve brought this to ... Anderson[’s] attention, but to-date I’ve no response.... ”
Evidentiary Hearing
The postconviction court conducted an evidentiary hearing on select claims in Jackson’s amended motion on November 4, 2011. During the evidentiary hearing, the defense presented two witnesses: co-defense counsel Richard Kuritz and co-defense counsel Gregg Steinberg. The State presented one witness, Assistant State Attorney Alan Mizrahi. Jackson also addressed the court and confirmed that during trial he was committed to lying to his counsel. He stated, “I was adamant about lying [to my attorneys] ... like I said if they would have came to me I would have been — I would have still said, no, I’m innocent ... I would have continued lying about that....”
Richard Kuritz
Richard Kuritz served as first chair of Jackson’s two-person defense team. As Jackson’s attorney, Kuritz was in charge of the guilt phase of the trial. Kuritz testified that prior to representing Jackson in this ease he had participated in at least twelve first-degree murder cases of which “at least 10 or 12” involved the death penalty. He explained that the strategy during trial was to convince the jury that Jackson was a thief, not a murderer.
With regard to Jackson’s contention that Kuritz’s failure to engage in any victim outreach activities constituted ineffective assistance of counsel, Kuritz explained that he did not do so at the time because victim outreach was “totally the opposite of the strategy” that Jackson wanted to pursue. Kuritz stated that Jackson was against presenting “any mitigation whatsoever” and was “always adamant” that he was not guilty. Thus, his decision to not pursue victim outreach was in accordance with his client’s instructions.
With regard to Jackson’s claim that counsel was ineffective for failing to object to the questions asked by the prosecution, and answers given by certain witnesses, Kuritz explained that his decision was a matter of trial strategy and an effort to maintain credibility with the jury. This strategy included an intent to avoid appearing as an “obstructionist” and to eliminate unnecessary objections. During trial, Detective James Rowan of the North Charleston Police Department testified that he found a watch in Jackson’s hotel room and determined that it was purchased after the murders, probably with money obtained from the victims’ ATM card. Kuritz stated that he did not object to these statements because he believed Jackson would accept responsibility for stealing from the victims, but not for murdering them. Kuritz also stated that he did not object to “smart-alecky” comments from the prosecutor because he did not think it detracted from Jackson’s defense. In contrast, he thought that rude comments from the prosecutor may have diminished the State’s credibility with the jury.
With regard to the prosecution’s questioning of co-conspirator Bruce Nixon, Nixon was asked why Jackson directed Nixon to blindfold the victims. Nixon responded that he believed it was because Jackson did not want the victims to see the four co-conspirators kill them. Kuritz testified that he consciously decided not to *458 object to this question because Nixon’s response was “just kind of a common sense deduction.” Additionally, he explained that he did not want to suggest to the jury that “something more sinister” might be at play by objecting to the question.
Kuritz also testified that he did not object to the statement of Revis Sumner, the brother of one of the murder victims, because he did not believe the statement was improper. Revis had provided a victim impact statement addressing his grief, and Kuritz explained that he did not object because the “overwhelming nature” of the evidence clearly reflected that the victims had died a “horrible death,” and therefore the families of the victims had also suffered greatly.
Gregg Steinberg
Gregg Steinberg served as second chair of Jackson’s defense team, and was in control of the penalty phase of the trial. Steinberg explained that he did not object to testimony during the guilt phase of the trial because that was Kuritz’s responsibility.
He stated that he did not engage in victim outreach activities because Jackson would not accept responsibility for, or admit to, commission of the murders. Stein-berg stated that he did “spen[d] a good deal of time with [Jackson] going over various mitigation issues.” Steinberg also stated that he did not object to Revis Sumner’s victim impact statement because he believed it was admissible under Florida law.
Alan Mizrahi
Assistant State Attorney Alan Mizrahi served as primary counsel for the State during the majority of Jackson’s trial. Mizrahi explained that although the State considers the opinions of family and friends who survive the victim (“victim survivors”) when determining what charges and sentences to pursue against a defendant, the views of victim survivors are not dispositive. Mizrahi testified that the State makes an “independent determination” as to “what charges we file and what sentence we seek.” Mizrahi stated that in a “close” case, the opinions of victims’ survivors are more important, but Jackson’s ease was not a “close” one.
Jackson’s Confession
Although Jackson was not presented as a witness, at the conclusion of the eviden-tiary hearing Jackson notified the court that, against the advice of his counsel, he wanted to address the court. The court permitted him to provide a sworn statement. Among other statements, Jackson said:
First, I’d like to say that I am guilty for the crimes of first degree murder, kidnapping and robbery against Mr. and Mrs. Sumner. My reason for wanting to address the Court today is because of the many lies I told to everyone years ago at pretrial and then trial. I downplayed my involvement to look as if I were not guilty but the truth is that— the truth is that it was my idea to do this. Truly, I did not make anyone do anything. All were willing participants but I was, in fact, the leader. It was my idea to do it.
I lied to this Court all throughout my trial testimony, same to [defense counsel and the State]. Even more so I lied to the people who deserve the truth the most, the family of Mr. and Mrs. Sumner, and for that I am deeply sorry.
There are no words that I could ever offer that would convey the depth of my remorse or sorrow, but again I say that I am truly sorry for what I have done and though I’m undeserving, I do ask forgiveness. My desire today is to reconcile the truth to the family of Mr. and *459 Mrs. Sumner and to Your Honor, the attorneys and to the Court record. If necessary, I will answer any and all questions fully and truthfully. Thank you.
No questions followed.
On January 25, 2012, the postconviction court issued an order denying all of Jackson’s claims. This review followed.
ANALYSIS
Standards of Review
Ineffective Assistance: Trial Counsel
Claims of ineffective assistance of trial counsel are reviewed under the two-pronged standard established in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must establish that counsel’s performance was deficient. See id. at 687, 104 S.Ct. 2052. To do this, the defendant has the burden of identifying specific acts or omissions that demonstrate counsel’s performance was unreasonable under prevailing professional norms. See Duest v. State, 12 So.3d 734, 742 (Fla.2009). “[SJtrategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). In essence, the defendant must show that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Strickland, 466 U.S. at 687, 104 S.Ct. 2052. As noted by this Court,
There is a strong presumption that trial counsel’s performance was not deficient. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158,100 L.Ed. 83 (1955)). “Judicial scrutiny of counsel’s performance must be highly deferential.” Id.
Johnston v. State, 63 So.3d 730, 737 (Fla. 2011) (parallel citations omitted).
Second, the defendant must establish that counsel’s deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. The defendant must demonstrate “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome” of the trial. Id. at 694, 104 S.Ct. 2052.
This Court employs a mixed standard of review when evaluating Strickland claims because such claims present mixed questions of law and fact. See Anderson v. State, 18 So.3d 501, 509 (Fla. 2009). This Court defers to the postcon-viction court’s factual findings that are supported by competent, substantial evidence, but reviews the court’s legal conclusions de novo. Id.; see also Simmons v. State, 105 So.3d 475, 487 (Fla.2012) (citing Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004)).
This Court employs different standards of review when it evaluates claims that follow an evidentiary hearing *460 as compared to those that are ruled upon based on the record alone. This Court accords deference to the postconviction court’s factual findings following its denial of a claim after an evidentiary hearing. See Connor v. State, 979 So.2d 852, 858 (Fla.2007) (citing McLin v. State, 827 So.2d 948, 954 n. 4 (Fla.2002)). “As long as the trial court’s findings are supported by competent substantial evidence, ‘this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.’ ” Id. (quoting Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997)). The postconviction court’s legal conclusions, however, are reviewed de novo. Id.; see also Sochor, 883 So.2d at 771-72. When evaluating claims that were summarily denied without a hearing, this Court will affirm “only when the claim is ‘legally insufficient, should have been brought on direct appeal, or [is] positively refuted by the record.’ ” Reynolds v. State, 99 So.3d 459, 471 (Fla.2012) (quoting Connor, 979 So.2d at 868), cert. denied, — U.S. —, 133 S.Ct. 1633, 185 L.Ed.2d 620 (2013); Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000).
Victim Outreach Activities
In his first claim, Jackson alleges that if his counsel had engaged in victim outreach, the victim survivors may have been more amenable to a non-death sentence, and such activity may have “soften[ed] the blow” of the victim impact statements read to the jury and motivated the survivors to urge the trial court to be merciful during sentencing. Jackson has failed to establish that defense counsel provided ineffective assistance with regard to this issue, and we affirm the denial of this claim.
In its order, the postconviction court noted that it was unclear whether this contention “even presents a legally cognizable claim.” The postconviction court was unable to find any authority to support “the notion that trial counsel violates his duty under the Sixth Amendment if he fails to contact the victims’ family members in an attempt to persuade them to go to the prosecutor and plead for mercy.” Like the postconviction court, we have not located authority that supports the claim that trial counsel violates his or her duty to provide effective assistance if he or she fails to contact a victim’s family members in an attempt to persuade them to plead for mercy on behalf of a capital defendant.[2] In his brief on appeal, Jackson provides only one case to support this claim, Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), in which the Supreme Court held that the conduct of counsel “fell short of the standards for capital defense work” articulated by the American Bar Association. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (1989) (“ABA Guidelines ”). *461 See 539 U.S. at 524, 123 S.Ct. 2527.[3] However, this case is inapposite as it addressed whether defense counsel exercised reasonable professional judgment when investigating and presenting mitigation evidence — not whether defense counsel exercised reasonable judgment with regard to victim outreach activities. See id. at 519— 34, 123 S.Ct. 2527. In Wiggins, the Supreme Court
emphasize[d] that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the “constitutionally protected independence of counsel” at the heart of Strickland, 466 U.S. at 689 [104 S.Ct. 2052]. We base our conclusion on the much more limited principle that “strategic choices made after less than complete investigation are reasonable” only to the extent that “reasonable professional judgments support the limitations on investigation.” Id. at 690-91 [104 S.Ct. 2052], A decision not to investigate thus “must be directly assessed for reasonableness in all the circumstances.” Id. at 691 [104 S.Ct. 2052].
539 U.S. at 533, 123 S.Ct. 2527 (emphasis omitted).
Here, despite his admission during the trial that he robbed the Sumners, accessed their bank accounts, and stole their money, Jackson was committed to claiming his innocence as to the kidnappings and murders. Since his convictions, Jackson has changed his position and confirmed, both verbally and in writing, his involvement and leadership in the murders. During the evidentiary hearing, Jackson stated that he was the leader of the plan to kidnap and murder the Sumners. Jackson also stated that at the time of the trial he “was adamant about lying ... adamant about [his] innocence,” and that, had defense counsel encouraged him to tell the truth, he would have rejected such advice. Cf. Jackson v. State, 18 So.3d at 1024 (“Jackson apologized to the victims for their loss but stated that he could not show remorse for offenses that he did not commit. Jackson maintained that he did not plan or participate in the kidnappings or murders.”). Given the limitations Jackson placed upon his counsel during his trial, and his refusal to admit his involvement in the murders, counsels’ decision to not pursue victim outreach was clearly the product of “reasonable professional judgment,” and this claim is not supported by Wiggins.
As noted by the postconviction court, victim outreach activities are appropriate and more effective in capital cases where the defendant is remorseful and willing to fully admit his or her involvement in the murder. See also ABA Guidelines, at *95 (With regard to contacting the family of the victim, “[c]ounsel should be creative in proposing resolutions that may satisfy the needs of the victim’s family, including ... arranging an apology....”). Jackson has confirmed that at the relevant time he was unwilling to admit any involvement in the kidnappings and murders.
Following the evidentiary hearing, the postconviction court concluded that de *462 fense counsels’ explanations as to why they did not pursue victim outreach were credible. The court believed their testimony that this approach was directly contradictory to their trial strategy, and Jackson himself confirmed it. In light of no factual dispute, we conclude that the postconviction court properly denied this claim as without merit. Further, competent substantial evidence was available to support that legal conclusion that counsels’ conduct was reasonable and did not prejudice Jackson.
Although Jackson’s postconviction motion suggests that this claim is directed toward all of the victims’ surviving family members, during the evidentiary hearing postconviction counsel clarified that the claim addressed only victim outreach activities with regard to Rhonda Alford, Carol Sumner’s daughter and James Sumner’s step-daughter. Although Alford was scheduled to appear by telephone at the hearing, she changed her mind and decided that she would not testify. Alford informed the prosecutor that testifying would be “too stressful” and that she did not want to “open up ... wounds.” Jackson did not request a continuance or seek to compel Alford to testify; rather, Jackson stated that “[i]f [Alford] doesn’t want to speak, she doesn’t have to.” Later, Jackson confirmed his decision to waive her appearance at the hearing, and no victims’ survivors testified.
The only evidence indicating that Alford may have suggested to the court in Jackson’s capital case that she opposed the death penalty was her alleged statements to the trial court during the penalty phase of Jackson’s co-defendant, Alan Wade. During Jackson’s trial, Alford did not address the issue of the death penalty when she read her victim impact statement, nor did she do so in “multiple conversations” the prosecution represented to having had with her. Furthermore, in its denial order, the postconviction court concluded that had Alford attempted to present her feelings about the death penalty during the penalty proceeding of Jackson’s trial, the court “wouldn’t [have] let her testify” about this issue. Given that Alford would have been prohibited from discussing the death penalty, Jackson has not shown that his counsel was deficient for failure to conduct victim outreach with her.
Additionally, even if defense counsel had engaged in victim outreach activities and Jackson had accepted responsibility for his actions, Jackson provided no evidence to indicate that, had the victims’ families urged the State to pursue lesser sentences, there was a reasonable probability or likelihood that the State would have done so. Assistant State Attorney Mizrahi testified that the State Attorney’s Office independently determines what charges to file and sentences to seek against defendants. Mizrahi noted that in a “close” case the opinions of victims’ survivors may factor more heavily into the State Attorney’s assessment of charges and sentences, but Jackson’s case was not one of these. Thus, Jackson has not established that he suffered prejudice because the prosecutor himself testified that Alford’s position would not have affected the State’s decision to pursue the death penalty.
Jackson, therefore, has not demonstrated that counsel’s performance was ineffective, and we affirm the denial of this merit-less claim.
Jailhouse Telephone Conversation
Jackson next contends that this Court should find his trial counsel ineffective because counsel failed to preclude the admission of a South Carolina jailhouse telephone conversation between Jackson and his grandmother. He asserts that his language was so offensive and disrespectful that the admission of the conversation *463 damaged, if not fully destroyed, his chance of receiving a life sentence. He also contends that even if counsel did not provide ineffective assistance by failing to seek to suppress the conversation in its entirety, his counsel was ineffective because counsel failed to seek redaction of defamatory and offensive language from the conversation. Although defense counsel filed a motion to suppress the recording at issue prior to trial, Jackson believes the motion’s inadequacy constituted ineffective assistance. We affirm the denial of this claim because the record conclusively demonstrates that Jackson had no legitimate expectation of privacy in the phone call, that suppression was futile, and that counsel did not provide ineffective assistance.
The conversation at issue, which was played for the jury during trial, provides:
UNIDENTIFIED VOICE: Hello.
RECORDED ANNOUNCEMENT: This call is from the Charleston County Detention Center.
UNIDENTIFIED VOICE: Oh, shit.
RECORDED ANNOUNCEMENT: Any attempt to use three-way or call waiting will automatically disconnect the call. This a — (inaudible)—collect call....
JACKSON: Hey.
UNIDENTIFIED VOICE: Hey.
RECORDED ANNOUNCEMENT: Hang up to decline the call or to accept the call dial five now. This call is monitored or recorded.
JACKSON: Hey, what’s up?
JACKSON’S GRANDMOTHER: Michael, I want to come see you tomorrow. Put me on the book.
JACKSON: You going to come up here today?
JACKSON’S GRANDMOTHER: No. I called them down there and they told me, no, to come tomorrow but I could only come if you told them I could.
JACKSON: I don’t know how to do that shit.
JACKSON’S GRANDMOTHER: Well, that’s what they told me. You have to let them know to let me in.
JACKSON: I need you to get me some fucking money, man. I need you to—
JACKSON’S GRANDMOTHER: What money?
JACKSON: All right.... I got to bond (out) today to do this, all right? My shit is $5,000. Alan[4] is $5,000.
JACKSON’S GRANDMOTHER: Michael, listen to me and don’t say a word. You’re in the newspaper, all over the newspaper, yesterday and today.
JACKSON: For what?
JACKSON’S GRANDMOTHER: Murder. Hang on. And I don’t mind spending the money to tell you.
JACKSON: What?
JACKSON’S GRANDMOTHER: Bodies I.D.’d as former South Carolina couple, James and Carol Sumner, were in their Charleston home. Jacksonville Sheriffs Department — all right. Bail was denied for 18-year-old Bruce Nixon of Florida who was arrested and charged with murder, home invasion robbery and kidnapping. He took them to the grave site and everything.
JACKSON: Oh, my God, man. He took them to the fucking — are you kidding me?
JACKSON’S GRANDMOTHER: It’s right here in today’s paper....
JACKSON: Bruce took them to that fucking spot?
*464 JACKSON’S GRANDMOTHER: He didn’t say anything — wait a minute. Let me see what he says — Bruce—all right. Alan Wade 18, Tiffany Cole 23 and Michael Jackson 23. Authorities say the three were arrested in North Charleston on Thursday night after allegedly using the bank card belonging to the Sumners. They face credit card fraud charges in North Charleston.... In Florida authorities gave local police the tip that led to the three captives.
JACKSON: Mother fucking showed them where the spot was at.
JACKSON’S GRANDMOTHER: Yes, dear.
JACKSON: Bruce just killed us all.
JACKSON’S GRANDMOTHER: Yes, dear. Any questions?
JACKSON: I don’t know.
JACKSON’S GRANDMOTHER: What did I tell you the last time I talked to you? Never trust nobody.
JACKSON: We got fucking arrested. We couldn’t get in touch with him or nothing to tell him that the—
JACKSON’S GRANDMOTHER: Honey, somebody told on him. He took — he took — he took — how did you get the credit cards?
JACKSON: We got that. I don’t know, man. Oh, my God. Listen. What’s— what’s going on — okay. I got — I got to bail out here and get to fucking Jacksonville somehow.
JACKSON’S GRANDMOTHER: If I pay your bail you will not get out. I’ve done tried.... They holding you for Florida to come get you.
JACKSON: I know. But maybe Florida is going to charge me and I can get a bond.
JACKSON’S GRANDMOTHER: You cannot get out here. They will not let me pay bond, nothing_They denied everybody.
JACKSON: So they’re going to fuck around and deny my bond?
JACKSON’S GRANDMOTHER: They’re coming after you from Jacksonville, Florida.
JACKSON: For fucking murder?
JACKSON’S GRANDMOTHER: That’s what it says, accessory to murder. That’s what’s at the police force ... You’re all in the newspaper with your picture, Tiffany’s picture, Alan’s and Nixon’s....
JACKSON: Yeah. We’re probably in the same picture in Florida, too.... Oh, my God.... I didn’t touch them fucking people though.
JACKSON’S GRANDMOTHER: Whether you touched them or not, you’re an accessory because you have credit cards and you’ve been using their credit cards. If they can prove that you were anywhere around when that body was disposed of you’re an accessory and all of you, every one of you, are looking at a big, long stay.
JACKSON: No. The most they can give you for an accessory is up to ten years. Fuck that. Oh, my God. I need a fucking lawyer. I need a goddamn fucking lawyer.
JACKSON’S GRANDMOTHER: I don’t know if Nixon went bragging. I don’t know what happened.
JACKSON: Bruce didn’t brag. They fucking found him and he started crying like a little bitch and they started threatening, telling him that we told on him and all this other shit. I guarantee it and he took them right out to that fucking spot.
JACKSON’S GRANDMOTHER: Well, he’ll get a lighter sentence if he snitched.
JACKSON: Oh, my God, man. God— oh, my fucking God. Alan and them—
*465 JACKSON’S GRANDMOTHER: How did you get the credit card?
JACKSON: Alan and all them, man. Alan don’t even know this probably, man.
[[Image here]]
JACKSON: Bruce found the fucking— Bruce told them where the fucking shit— me and Alan both said we got to get in touch with Bruce to tell him to get the hell out. of town....
JACKSON: Bruce found the fucking— Bruce told them where the fuck these people were at. Oh, my God. How the fuck could he do that? Bruce just hung us all.
JACKSON’S GRANDMOTHER: Yeah.
[[Image here]]
RECORDED ANNOUNCEMENT: This call is monitored or recorded.
[[Image here]]
JACKSON: I’ll see what — goddamn. I can’t believe Bruce fucking did this, man. Alan and Tiffany don’t even know that we’re about to all go down.
JACKSON’S GRANDMOTHER: Well, I don’t think I can see Alan or Tiffany.
[[Image here]]
JACKSON’S GRANDMOTHER: How did you get into this?
JACKSON: I told them I called you and told you about the bullshit.
JACKSON’S GRANDMOTHER: Yeah.
JACKSON: Yeah. But, Mom,[5] like I said, we were clean, man. We had — everything was fíne.
JACKSON’S GRANDMOTHER: You may be clean but you ain’t going to be clean now, not with the way the papers are going.
[[Image here]]
JACKSON: Well, then police put that in there for their own bullshit fucking games. Bruce told them every fucking thing they wanted to hear. I guarantee it. He got scared. He ain’t never been in trouble before and now he about to go down. They told him, hey, if you tell us what happened, show us where the bodies are at, we’ll let you off. Guarantee that’s what the fuck he did.
JACKSON’S GRANDMOTHER: Well, he’s up for murder now.
JACKSON: Yeah. I know. He fucked hisself [sic].
JACKSON’S GRANDMOTHER: How did they die?
JACKSON: Bruce and Alan took care of that.
[[Image here]]
JACKSON: Yeah. But, Mom, they’re hitting me with accessory. Goddamn, that’s up to ten fucking years, man. I don’t want to do no ten fucking years in fucking jail, not in Jacksonville....
JACKSON’S GRANDMOTHER: There’s pictures, good pictures. You took a good picture. You’re the only one that come[s] out good and clear. Everybody else looks green.
JACKSON: Ain’t that a son of a bitch. I don’t know what to do now except, you know, be fucked....
JACKSON’S GRANDMOTHER: All right. I’ll talk to you later. I love you.
JACKSON: I love you too, Ma. I’m not — I’m not fucking sad or nothing, you know. I’m freaking the fuck out because Bruce told these fucking people where it’s at.... [Ljisten.... I’m going to give Alan *466 your number and I’m going to give Tiffany your number, okay? Listen, we have to all have the same fucking story here, man....
JACKSON’S GRANDMOTHER: Yeah.
JACKSON: I’m going to need you to relay fucking messages through me, Alan and Tiffany.
JACKSON’S GRANDMOTHER: And don’t forget these are $5.56 a call — ....
JACKSON: Fuck the $5, okay? This is — I’m looking at 10, 15 fucking years here, okay?
JACKSON’S GRANDMOTHER: I know.
JACKSON: That’s what I’m saying. I’ll pay you the $5. Listen, this fucking — I got a whole other eight grand sitting in Alan’s fucking bank account....
[[Image here]]
JACKSON: All right. I love you.
JACKSON’S GRANDMOTHER: I love you too.
On January 18, 2006, North Charleston Police Detective James Rowan stated during a deposition that he “believed” law enforcement is required to obtain a search warrant before acquiring jail telephone calls pursuant to South Carolina law and Charleston County Jail policy. He stated that “if I got [the phone recordings] for the Jacksonville detectives then I did a search warrant for them to get them.... If I got them I got them by search warrant. That was the only way I could get them.” Detective Rowan also stated that he “believed” a recorded phone message was played and warning signs were posted in the jail telephone area to notify inmates that their calls were recorded. Detective Rowan’s deposition was addressed in the original motion to suppress the admission of the conversation filed by Jackson’s trial counsel.
On May 1, 2007, the trial court held a hearing on Jackson’s motion to suppress. The motion alleged that to legally obtain the recording, “law enforcement must obtain a warrant in conformity with South Carolina law and Charleston County Jail policy.” The trial court requested that defense counsel provide specific, South Carolina legal authority to demonstrate that a warrant was required to acquire and use recorded jail telephone conversations. Defense counsel did not provide this authority. Subsequently, the trial court denied the motion.
Procedural Bar
To the extent that Jackson alleges South Carolina law protects the confidentiality of his jailhouse telephone conversations, this claim is procedurally barred. See Walker v. State, 88 So.3d 128, 137 (Fla.2012) (noting that defendant is not permitted to relitigate a claim on postcon-viction appeal where the underlying issue was raised on direct appeal) (citing Green v. State, 975 So.2d 1090, 1106 (Fla.2008)). This claim was already presented, considered, and rejected by this Court on direct appeal. See Jackson, 18 So.3d at 1029-30. Further, Jackson cannot now bypass this procedural bar by couching this claim as ineffective assistance. See Vining v. State, 827 So.2d 201, 211 (Fla.2002) (noting that because the claim was raised and rejected on direct appeal, recharacterizing the claim in terms of ineffective assistance would not bypass the procedural bar).
Nevertheless, even if this claim is not procedurally barred, we deny relief because it is without merit. Jackson’s allegation that defense counsel was ineffective because counsel failed to provide available and relevant South Carolina legal authority to support the motion is incorrect.
Merits of the Claim
Jackson’s support for this claim of suppression is threefold: (1) Detective Row *467 an’s statements from his deposition; (2) a boilerplate motion to suppress recordings of inmates’ telephone conversations generally filed by the Office of the Public Defender in Charleston, South Carolina; and (3) section 17-30-80 of the South Carolina Code titled “Interception of Wire, Electronic, or Oral Communications” (the “South Carolina Wiretap Act”). We conclude that none of these bases for support demonstrate that a warrant was required to introduce Jackson’s jailhouse telephone conversation to the jury.
First, a detective’s testimony does not support the admission or rejection of evidence, nor an allegation of counsel’s deficiency in a court of law. A detective’s expressed beliefs, even under oath, are not legal authority. Although helpful to courts and deserving of both consideration and deference when addressing matters of police practice and policy, a detective’s statements concerning what the law is would be secondary to a court’s analysis of the law as written. Particularly when, as discussed in the section below discussing the South Carolina Wiretap Act, such statements appear to be legally inaccurate.
Second, as articulated in the order denying postconviction relief, Detective Rowan was not presented at the evidentiary hearing. Consequently, any additional light that the detective could have shed on South Carolina’s wiretapping laws was not available to the postconviction court, nor to this Court. By not presenting Detective Rowan to testify at the evidentiary hearing, Jackson has not demonstrated that the detective could provide additional information in support of this claim. Therefore, this asserted basis does not support Jackson’s claim, nor reflect how his counsel provided ineffective assistance.
Jackson next claims that defense counsel would have successfully suppressed the jailhouse telephone call if counsel had contacted the Office of the Public Defender in Charleston, South Carolina, and requested a copy of its form motion to suppress jail telephone recordings. Jackson contends that the Public Defender’s motion relies upon the following cases that support his claim: State v. Mattison, 352 S.C. 577, 575 S.E.2d 852 (App.2003); U.S. v. Turner, 169 F.3d 84, 87 (1st Cir.1999); U.S. v. Lanoue, 71 F.3d 966, 981-82 (1st Cir.1995); Bell v. Wolfish, 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Katz v. US., 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); In the Matter of An Anonymous Member of the S.C. Bar, 304 S.C. 342, 404 S.E.2d 513 (1991); and State v. Forrester, 343 S.C. 637, 541 S.E.2d 837 (2001). Jackson does not provide anything more than the conclusory statement that “all of these cases could have [been] cited by [defense counsel]” in support of the motion to suppress.
Moreover, despite Jackson’s reliance on these eases, they are either inapposite to Jackson’s circumstances or contradict his claim that the monitoring and recording of his call violated his privacy, and thus his constitutional rights. See Mattison, 575 S.E.2d at 855-57 (holding that the defendant voluntarily consented to a search, and the pat-down of his person did not exceed the scope of his consent, which included a search of the groin area); Turner, 169 F.3d at 86 (holding that because the defendant’s written consent to a search of “the premises,” “his vehicle,” and “personal property,” did not cover the defendant’s personal computer, the police exceeded the scope of consent, and the defendant’s photographs of child pornography were properly suppressed); Lanoue, 71 F.3d at 981 (stating that the court would not address whether the defendant consented to the interception of telephone calls, but specifically noting that the defendant was not provided with notice that his calls would be *468 monitored as mandated by federal regulations); Bell, 441 U.S. at 545-46, 99 S.Ct. 1861 (“[S]imply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations.... The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights.”); Katz, 389 U.S. at 353, 359, 88 S.Ct. 507 (The Katz Court concluded that where the government electronically listened to and recorded the defendant’s conversations while he used a public telephone, the actions of the government violated the defendant’s privacy, and the constitutional standards of the Fourth Amendment. This case included no evidence that the defendant received notice or any indication that his calls would be monitored or recorded.); In the Matter of An Anonymous Member of the S.C. Bar, 404 S.E.2d at 514 (ruling that an attorney shall not record the conversation of any person without the prior knowledge and consent of all parties to the conversation); Forrester, 541 S.E.2d at 843 (holding that the defendant’s consent to allow the officer to search her purse by way of holding it open for the officer was for consent to a “limited view of the purse’s interior,” not to “surrender possession ... for an unrestricted search,” and thus the officer exceeded the scope of the defendant’s consent).
In sum, all of the aforementioned cases are distinguishable. Jackson has provided no legal authority in which a South Carolina or other state or federal court has ruled that an inmate does not consent to the monitoring or recording of his or her telephone call when continuing the conversation on a phone in jail after advisement that the call will be monitored or recorded. Similarly, Jackson has not provided legal authority that South Carolina law enforcement must obtain a court order or warrant to acquire recorded phone conversations in that state’s jails. Jackson, therefore, has not demonstrated that defense counsel was deficient, nor was he prejudiced by trial counsel failing to find and provide relevant legal authority to support suppression of the conversation, and counsel cannot provide that which does not exist.
Finally, the two sections of the South Carolina Code relevant to Jackson’s claim are sections 17-30-30(B) and 17-30-25(B)(2). Section 17-30-25(B)(2) provides:
(B) Notwithstanding any other provision of law, a provider of wire, oral, or electronic communication service, or an officer, employee, or agent thereof, or landlord, custodian, or other person may provide information, facilities, or technical assistance to a person authorized by law to intercept wire, oral, or electronic communications if the provider, or an officer, employee, or agent thereof, or landlord, custodian, or other person, has been provided with:
[[Image here]]
(2) a certification in writing by a person specified in Section 17-30-95 that no warrant or court order is required by law, that all statutory requirements have been met, and that the specified assistance is required, setting forth the period of time during which the provision of the information, facilities, or technical assistance is authorized and specifying the information, facilities, or technical assistance required.
S.C.Code Ann. § 17-30-25(B)(2) (2012) (emphasis supplied). Section 17-30-30(B) provides:
It is lawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where the person is a party to the communication or one of the parties to the communication has given prior consent to the interception.
*469 S.C.Code Ann. § 17-30-30(B) (2012) (emphasis supplied). Thus, under section 17-30-25(B), those who provide wire or electronic communication services may provide technical assistance to persons authorized by law to intercept oral communications if the provider has received either a court order directing such assistance or a certification in writing that states no warrant or court order is required by law. If, however, one of the communicating parties consented to the interception, then resort to this section of the code is unnecessary as provided in subsection 17-30-30(B).
In our decision on direct appeal, we held that Jackson implicitly consented to the interceptions because he did not have a reasonable expectation of privacy in the conversations, and society’s interest in institutional security permits the monitoring of jailhouse conversations. See Jackson, 18 So.3d at 1030 (“Jackson was aware through repeated, automated warnings that the jail would record and monitor his communication.”). This Court explained that Jackson consented to the interception when he continued to speak with his grandmother despite hearing, at the beginning of the call, an automated voice informing him that the call would be “monitored or recorded,” and then having this warning repeated later in the conversation. Id. at 1029. As stated in subsection 17-30-30(B), consent provides an independent basis for the lawful interception of a telephone conversation. This Court has already ruled on direct appeal that Jackson implicitly consented to the interception, and we again reach the same conclusion that the interception did not violate Jackson’s privacy rights.
Although Jackson is correct that defense counsel did not provide the South Carolina authority he contends would have afforded his communication protected status, in Jackson’s direct appeal this Court held that the Florida Security of Communications Act (“Communications Act”), Chapter 934, Florida Statutes, was “essentially identical” to that of the South Carolina Wiretap Act, and thus could be relied upon to resolve Jackson’s claim. Jackson, 18 So.3d at 1029. In Jackson, this Court addressed its opinion in State v. Smith, 641 So.2d 849, 851 (Fla.1994), which analyzed the Communications Act with regard to expectations of privacy in a police vehicle. Jackson, 18 So.3d at 1029. The Court in Smith held that the Communications Act did not protect the defendant’s communications in the back of a police vehicle, Smith, 641 So.2d at 851-52, and, correspondingly, the Communications Act did not protect Jackson’s jailhouse conversations with his grandmother. See Jackson, 18 So.3d at 1030. The Court explained that although both the Florida and South Carolina constitutions “protect the privacy rights of citizens from the unreasonable interception of communications,”
[ujnder both the Fourth Amendment and the Florida wiretapping act, a speaker must have an actual subjective expectation of privacy and our society must recognize that the expectation is reasonable for the oral conversation to be protected. See Smith, 641 So.2d at 852. Thus, there is no reasonable expectation of privacy in a police vehicle or in a telephone communication from jail during which warnings are issued; therefore, any interception of conversations that occur there would not be prohibited by chapter 943.
Jackson, 18 So.3d at 1029-30. Jackson has not demonstrated that his counsel was deficient, nor is this Court’s confidence in the outcome of his trial undermined because he has yet to provide a concrete legal basis for this Court to hold that his jailhouse communication was private. Instead, this aspect of the claim conveys to this Court that Jackson is merely dissatis- *470 fled that his counsel was unable to procure a favorable ruling with regard to his jailhouse telephone calls. Accordingly, we hold that Jackson has failed to demonstrate ineffective assistance of counsel with regard to his claim challenging the admission of the recorded jail conversation.
The Redaction of Inflammatory Language
Jackson next alleges that the inclusion of his crude language in the recorded conversation (and thus the failure of defense counsel to seek its redaction) portrayed him “as a profane and disrespectful son” and constituted an “aggravating circumstance not specifically allowed by Florida’s death-sentencing statute.” He asserts that because his trial occurred in a “very conservative, southern, ‘bible belt,’ venue,” his language “tipped the scales of justice against [him]” and motivated the jury to recommend a sentence of death. To the extent that Jackson contends his trial counsel was ineffective because counsel did not seek a redaction of certain language in the call or that counsel failed to find otherwise available legal support for this claim, it is properly raised here, but because it lacks merit we affirm the denial of the postconviction court.
The postconviction court did not specifically address this subclaim in its order, and Jackson failed to request a specific ruling on it. In accordance with Lambrix v. State, 39 So.3d 260, 273 n. 13 (Fla.2010), in which we held that the failure to secure a ruling by the court below on a given claim waives it, Jackson has waived this claim. However, even if he did not waive this claim, we deny relief because it lacks merit.
According to section 921.141(5), Florida Statutes, a court may consider only those aggravating circumstances delineated in the statute. See § 921.141(5), Fla. Stat. (2005) (“Aggravating circumstances shall be limited to the following....”). Consequently, the State acts improperly if it offers evidence in aggravation other than that outlined in the statute, and the trial court errs if it considers aggravating evidence not provided in the statute. Here, although the jury heard Jackson use profanity when speaking with his grandmother by virtue of the presentation of the recorded conversation during trial, the State did not assert that the jury should consider such language in its sentencing recommendation. During the penalty phase, Jackson’s character was addressed solely with regard to the kidnapping, abuse, and murder of the Sumners — two older, disabled individuals who ultimately died because they were buried alive. The State neither mentioned nor alluded to Jackson’s profanity or any alleged disrespect toward his grandmother contained in the jailhouse telephone conversation. Similarly, the sentencing order of the trial court does not reflect that the court, sua sponte, considered Jackson’s language as an aggravator. Moreover, the sentencing instructions to the jury did not include any reference to Jackson’s profanity or alleged disrespect toward his grandmother. Thus, there is no indication from the record that Jackson’s language was improperly considered in aggravation.
Rather, the order of the trial court reflects that it considered and found the following eight aggravators: (1) Jackson was previously convicted of a felony and was on probation at the time of the murders; (2) Jackson was previously convicted of another capital felony because the murders occurred contemporaneously; (3) the murders for which Jackson was sentenced were committed while Jackson was engaged in the felony of kidnapping; (4) the murders were especially heinous, atrocious, or cruel (HAC); (5) the murders were committed in a cold, calculated, and *471 premeditated manner without any pretense of moral or legal justification (CCP); (6) the murders were committed for financial gain; (7) the murders were committed to avoid or prevent a lawful arrest; and (8) the victims were particularly vulnerable due to advanced age or disability.
In sum, each of Jackson’s claims in support of this issue is “legally insufficient ... or positively refuted by the record.” Con-nor, 979 So.2d at 868. Jackson has failed to demonstrate that had defense counsel filed an “adequate” motion to suppress, the trial court probably would have granted the motion or that this Court’s confidence in the proceeding should be undermined due to the lack of such motion. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Further, given that Jackson acknowledges his trial counsel filed a motion to suppress, to the extent that he contends the motion was inadequate, this Court has rejected such an argument before, albeit with regard to habeas claims against appellate counsel. See Thompson v. State, 759 So.2d 650, 657 n. 6 (Fla.2000) (noting that appellate counsel raised the issue, and the petitioner’s claim “ ‘merely expresses dissatisfaction with the outcome of the argument in that it did not achieve a favorable result for petitioner.’ ... [We] decline petitioner’s invitation to utilize the writ of habeas [corpus] as a vehicle for the rear-gument of issues which have been raised and ruled on by this Court.” (quoting Routly v. Wainwright, 502 So.2d 901, 903 (Fla.1987) (alteration in original))).
Additionally, with regard to Jackson’s allegation that even if the conversation was properly admitted, his counsel was ineffective for failing to redact defamatory and allegedly disrespectful language, Jackson has not demonstrated that counsel was deficient or that he was prejudiced by counsel’s performance. Had the contested language been removed, it would have been replaced by something else, such as a sound, which would have conveyed to the jury (like the actual words) that Jackson used expletives during the conversation with his grandmother. It is reasonable to assume that the insertion of some sound to mask the profane language would have been more distracting and disruptive for the jurors than presenting the conversation unadulterated and as it actually transpired. The conversation, as relevant evidence, was admissible and not unduly prejudicial such that the trial court should have required its redaction in accordance with the relevant section of our evidence code. See § 90.403, Fla. Stat. (2005) (“Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.”). Thus, with regard to this point, Jackson has not demonstrated that counsel was deficient, nor that counsel prejudiced his case. See Strickland, 466 U.S. at 689-90, 694,104 S.Ct. 2052.
Therefore, we conclude that the postcon-viction court properly denied this claim as without merit.
Speculative Questions and Answers
Jackson next contends that defense counsel was ineffective for failing to object to allegedly argumentative and speculative witness questions from the prosecution and answers to those questions by particular witnesses. As noted earlier, “[t]here is a strong presumption that trial counsel’s performance [is] not deficient.” Johnston, 63 So.3d at 737. Further, “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone, 768 So.2d at 1048. Because defense counsel here provided *472 reasonable explanations as to why there was no objection to the questions and statements now contested, and Jackson has failed to demonstrate that his counsel was deficient or that any alleged deficiency prejudiced his case, we deny relief on this claim.
Testimony of Detective Rowan
During trial, Detective Rowan testified that a wristwatch found in Jackson’s hotel room probably had been purchased with money Jackson obtained from the victims’ ATM card. Although Jackson challenges this testimony, he does not explain how this comment prejudiced his case; rather, he generally addresses the principle that counsel should object to speculative questions.
During the evidentiary hearing, defense counsel Kuritz explained that he did not object to Detective Rowan’s statement because he believed that doing so would compromise Jackson’s credibility with the jurors. Kuritz stated that the strategy for Jackson’s trial was to admit that Jackson committed crimes of theft, but not murder. Kuritz explained that clear evidence — in the form of both video and photographs— were available to prove that Jackson had stolen the victims’ ATM card. Further, on direct examination Jackson conceded he had stolen the ATM card. Kuritz stated that because he believed this was a conclusion the jury would make from the evidence, an objection was unnecessary. He considered this to be a trivial issue, and he did not want to appear to the jury to be an obstructionist, nor did he want to make unnecessary objections.
Testimony of Bruce Nixon
Co-defendant Bruce Nixon testified 'that Jackson was the dominant actor who planned the subject crimes. On re-direct examination, the State asked Nixon the following question: “If you were the mastermind ... would you have let anyone else have that ATM card?” Kuritz testified during the evidentiary hearing that he did not object to this question because he thought it did not negatively affect Jackson’s defense and because he believed the prosecutor may have lost credibility with the jury when he acted like a “smart aleck.”
Jackson, however, alleges that this question was extremely damaging to his chance of receiving a life sentence recommendation from the jury because it implied that he was the ringleader. The State also asked Nixon why Jackson had ordered Nixon to blindfold the victims, to which Nixon responded “[i]t is a ‘mind thing.’ ... I guess [Jackson] didn’t want — he didn’t want them to see him kill them, I guess.” At the evidentiary hearing, Kuritz agreed that this question called for speculation, but explained that he did not object because he believed the answer to be “common sense,” and the response followed an “obvious flow.” Kuritz noted that his trial strategy included efforts to avoid appearing like Jackson was hiding something.
Testimony of Jackson
While testifying on his own behalf, the State asked Jackson, “[t]he truth as to any of this hurts you, right?” The State also asked Jackson if he held the flashlight up to illuminate the grave hole for the Sum-ners, “like a stage hand.” Kuritz stated that he did not object because, in his opinion, Jackson did an “excellent job” while testifying. Kuritz again noted that he wanted to avoid any suggestion that Jackson had something to hide and that he believed the State may have lost credibility with the jury by appearing condescending or facetious.
The postconviction court found Kuritz’s explanations as to why he did not object to *473 be based on strategy and to be credible. As discussed earlier, “this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.” Blanco, 702 So.2d at 1252 (internal quotations omitted); see also Cox v. State, 966 So.2d 3B7, 357-58 (Fla.2007). Kuritz’s testimony during the evidentiary hearing provides competent, substantial evidence to support this Court’s denial of relief. His decision to not object in these specific situations was reasonable given his strategy of judicious objection to maintain credibility with the jury. His decision to not object reflects a trial strategy oriented toward admitting certain crimes (i.e., theft) and not others (i.e., murder and kidnapping), and otherwise presenting Jackson in the best light, which included efforts to not appear as unnecessarily obstructionistic. Without other support for this claim, Jackson has not demonstrated that counsel’s performance was deficient under Strickland. Jackson has also failed to satisfy the prejudice prong of Strickland because he provides no argument as to how the failure to object with regard to these claims impacted the jury’s finding of guilt or the recommendation of death.
Jackson has not met either prong of Strickland to support a claim of ineffective assistance of counsel. Therefore, we hold that the postconviction court properly denied this claim.
Victim Impact Statement
Jackson alleges that the following excerpt from the victim impact statement of Revis Sumner, brother to victim James (“Reggie”) Sumner, was improper:
Losing them [James and Carol Sumner] has been very difficult for the family and it’s been hard for me because Reggie was not only my brother, he was my best friend. I feel this part of me is — this part of me is missing because we were so close. After a time the tears stop flowing, but the pain of losing Reggie and Carol will never go away.
Jackson agrees that the rest of Revis’s statement was relevant and admissible; however, he claims that defense counsel’s failure to object to Revis’s “grief’ statement amounts to ineffective assistance of counsel. We disagree and affirm the decision of the postconviction court to deny relief.
Section 921.141(7), Florida Statutes, governs the admission of victim impact evidence. It states:
Once the prosecution has provided evidence of the existence of one or more aggravating circumstances ..., the prosecution may introduce, and subsequently argue, victim impact evidence to the jury. Such evidence shall be designed to demonstrate the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.
§ 921.141(7), Fla. Stat. (2005).
Revis’s excerpted statement does not fall within one of the proscribed categories of victim impact evidence delineated in section 921.141(7). These proscribed categories are characterizations and opinions concerning (1) the crime, (2) the defendant, or (3) the appropriate sentence. See id. Revis’s statement addresses the pain and grief produced by the death. Moreover, we conclude that Revis’s sixty-four-word statement constitutes permissible victim impact evidence because it was directly related to the effect of James’s death on Revis. This statement is much like that which this Court held to be admissible in Abdool v. State, 53 So.3d 208 (Fla.2010), *474 cert. denied, — U.S. —, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011). In Abdool, we reviewed the following allegedly improper victim impact statement:
When I think about the agony this has caused me, it pales in comparison to the pain this has caused my son. Amelia had never been away from her brother Andrew. Andrew is two years younger. He loved — he looked up to his big sister and did everything with her. She drove him to school and she inspired him. He called her sister. Now I see him burning inside as he holds anger — as he holds his anger deep inside and I fear for the day when it will come out, and I fear losing my son, my only son, to this anger, pain, and remorse that can never be taken from him. That is more — that is one more future I cannot afford to lose.
Id. at 221. We held that the admission of this statement was not in error because it was limited to the impact the victim’s death had on the speaker and his son, and it was “directly related to the impact of [the victim’s] death ... on her family.” Id. at 222.[6] Further, this Court noted that the statement “did not offer any opinion about the crime, the defendant, or the appropriate sentence.” Id. Like the statement at issue in Abdool, Revis’s statement does not constitute improper victim impact evidence. Jackson, therefore, has not demonstrated that counsel’s failure to object to Revis’s statement was deficient or that the admission of the statement prejudiced his case. As a result, Jackson has failed to meet either of the two required prongs for an ineffective assistance of counsel claim under Strickland. Consequently, we hold that the postconviction court properly denied this claim as without merit.
Sentencing Phase
Jackson contends that the combination of errors asserted above deprived him of a fundamentally fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article 1, section 16, of the Florida Constitution, and thus rendered the results of his trial unreliable. Jackson also alleges that these errors establish that his counsel provided ineffective assistance in violation of the Fifth and Fourteenth Amendments to the United States Constitution and article 1, section 9, of the Florida Constitution.
We affirm the postconviction court’s denial of relief on this claim because all of Jackson’s foregoing claims are without merit. Indeed, “[w]here, as here, the alleged errors urged for consideration in a cumulative error analysis ‘are either merit-less, procedurally barred, or do not meet the Strickland standard for ineffective assistance of counsel[,] ... the contention of cumulative error is similarly without merit.’ ” Butler v. State, 100 So.3d 638, 668 (Fla.2012) (quoting Bradley v. State, 33 So.3d 664, 684 (Fla.2010) (alteration in original)), cert. denied, — U.S. —, 133 S.Ct. 1726, 185 L.Ed.2d 789 (2013); Israel *475 v. State, 985 So.2d 510, 520 (Fla.2008); Lowe v. State, 2 So.3d 21, 33 (Fla.2008); Parker v. State, 904 So.2d 370, 380 (Fla.2005).
Florida’s Death Sentencing Scheme
Jackson challenges the constitutionality of Florida’s death sentencing scheme as provided in section 921.141, Florida Statutes (2005). He contends that it is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because it permits a judge, without a jury determination of facts, to increase maximum sentences to death. This claim is procedurally barred and without merit.
First, this claim is procedurally barred because Jackson raised it on direct appeal and this Court rejected it. See Jackson, 18 So.3d at 1025 n. 6. Claims raised on appeal are procedurally barred in postcon-viction litigation. See Green, 975 So.2d at 1105 (“These issue are procedurally barred because they either were or should have been raised on direct appeal.”); Finney v. State, 831 So.2d 651, 657 (Fla.2002) (“Post-conviction motions are not to be used as second appeals.”); Parker, 904 So.2d at 375 n. 3.
Second, this Court has repeatedly held that Florida’s capital sentencing scheme does not violate the United States Constitution under Ring v. Arizona. See, e.g., Abdool, 53 So.3d at 228 (“This Court has also rejected [the] argument that this Court should revisit its opinions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and find Florida’s sentencing scheme unconstitutional.”).
Third, “[t]his Court has repeatedly held that Ring does not apply to cases where the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment aggravating factor is applicable.” Hodges v. State, 55 So.3d 515, 540 (Fla.2010), cert. denied, — U.S. —, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011). A prior violent felony conviction includes a conviction for a contemporaneous felony. See Frances v. State, 970 So.2d 806, 816 (Fla.2007) (“[T]he contemporaneous conviction of a violent felony may qualify as an aggravating circumstance, so long as the two crimes involved multiple victims or separate episodes.” (quoting Pardo v. State, 563 So.2d 77, 80 (Fla.1990))). The jury unanimously convicted Jackson for the murders and kidnapping of both James and Carol Sumner, thus satisfying the contemporaneous felony requirement and rendering Ring inapplicable. Further, this Court has held “that Ring is not implicated when the trial court has found as an aggravating circumstance that the crime was committed in the course of a felony.” Baker v. State, 71 So.3d 802, 824 (Fla.2011), cert. denied, — U.S. —, 132 S.Ct. 1639, 182 L.Ed.2d 238 (2012). Here, the trial court found, in aggravation, that the murders were committing during the course of a kidnapping. Thus, for this additional reason, Ring is not applicable.
Moreover, the aggravating circumstance of under-sentence-of-imprisonment includes a person who was “previously convicted of a felony ... or placed on community control or on felony probation.” § 921.141(5)(a), Fla. Stat. (2005). When Jackson murdered the Sumners, he had been previously convicted of a felony and was on probation. Accordingly, Ring is not applicable to this case.
Finally, the federal district court decision in Evans v. McNeil, 2011 WL 9717450, at *47-54 (S.D.Fla. June 20, 2011), aff'd in part, rev’d in part, 699 F.3d 1249 (11th Cir.2012), which held that Florida’s death penalty procedures violate Ring, is not a basis for relief. The Eleventh Circuit Court of Appeals overturned *476 Evans and held that Florida’s capital sentencing statute does not violate - a defendant’s Sixth Amendment rights as interpreted in Ring. Evans v. Sec’y, Fla. Dept, of Corrections, 699 F.3d 1249, 1266 (11th Cir.2012), cert. denied, — U.S.-, 133 S.Ct. 2393,185 L.Ed.2d 1105 (2013).
Accordingly, we conclude this claim is without merit and deny relief.
HABEAS CORPUS PETITION
Standard of Review
Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman, 761 So.2d at 1069. Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Lynch v. State, 2 So.3d 47, 84-85 (Fla.2008); Freeman, 761 So.2d at 1069. In raising such a claim, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997,1001 (Fla.1981).
Analysis
Jackson alleges that his appellate counsel was ineffective for two reasons. First, Jackson avers that appellate counsel failed to adequately raise and argue that the seizure of his jail telephone conversation was illegal. Second, Jackson contends that appellate counsel did not present a claim of fundamental error with regard to the trial court’s failure to redact sua sponte his profane language. Neither claim has merit.
First, appellate counsel raised the seizure issue on direct appeal. Appellate counsel alleged that Jackson’s telephone conversation should not have been admitted because it was seized in violation of South Carolina’s Wiretap Act. See Jackson, 18 So.3d at 1024 n. 5. This Court addressed, and rejected, the claim on the merits. Id. at 1029-31. Further, to the extent that Jackson alleges appellate counsel “inadequately” presented this claim, this Court has previously rejected such an argument as a basis for ineffective assistance. See Thompson, 759 So.2d at 657 n. 6.
Second, because Jackson has not provided case or statutory law to support his claim for suppression of the jailhouse telephone conversation, he has not demonstrated that appellate counsel provided deficient representation. Indeed, appellate counsel will not be deemed ineffective for failing to raise a claim that is without merit. See Freeman, 761 So.2d at 1070; Valle v. Moore, 837 So.2d 905, 908 (Fla. 2002) (noting that “appellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims on appeal”). Accordingly, appellate counsel’s performance here has not undermined this Court’s confidence in its decision on appeal. See Pope, 496 So.2d at 800. Jackson does not explain what counsel could have done to have “adequately” addressed this claim, and to the extent that he contends cases and statutory law are available to support it, our analysis of this argument in Jackson’s rule 3.851 appeal reflects otherwise. *477 Therefore, appellate counsel did not provide deficient representation.
Third, the admission of the unredacted conversation — profanity included — did not rise to the level of fundamental error. This Court engages in a fundamental error analysis when the alleged error was not objected to and therefore preserved for appeal. See Conahan v. State, 118 So.3d 718, 733-35 (Fla.2013); Valle, 837 So.2d at 908. Fundamental error is identified as that which
reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained ■without the assistance of the alleged error.” Harrell v. State, 894 So.2d 935, 941 (Fla.2005). We have also defined it as “error which goes to the foundation of the case.” Ray v. State, 403 So.2d 956, 960 (Fla.1981) (quoting Sanford v. Rubin, 237 So.2d 134, 137 (Fla.1970)). We have cautioned appellate courts to “exercise their discretion concerning fundamental error ‘very guardedly.’ ” Id. “[Fundamental error should be applied only in the rare cases where a jurisdictional error appears or where the interests of justice present a compelling demand for its application.” Id. “Specifically, prosecutorial misconduct constitutes fundamental error when, but for the misconduct, the jury could not have reached the verdict it did.” Miller v. State, 782 So.2d 426, 432 (Fla. 2d DCA 2001).
Farina v. State, 937 So.2d 612, 629 (Fla.2006).
Jackson has not demonstrated that the admission of the unredacted conversation could have affected the validity of the trial itself. See Harrell v. State, 894 So.2d 935, 941 (Fla.2005). The trial record and order of the trial court reflect that Jackson’s conviction and sentences were premised on the gruesome facts of this case — Jackson and his co-defendants decided to rob, kidnap, and murder Carol and James Sumner. As stated in the trial court’s order, the Sumners “were frail and were in incredibly bad health.” On the night of the murders, two of Jackson’s accomplices bound, gagged, and blindfolded the Sum-ners with duct tape. The accomplices then drove the Sumners, who were forced into the trunk of their own car, to a previously excavated gravesite, secured the duct tape that was binding them, retrieved their ATM-pin number, forced them into the grave, and then filled the grave with dirt with the Sumners alive inside. The Sum-ners were “buried alive, and suffered a slow and torturous death from the weight of the soil being built up around them and inhaled into their lungs until they lost consciousness and expired.” Accordingly, Jackson has failed to demonstrate prejudice because the appellate process was not compromised. Therefore, there was no ineffective assistance of appellate counsel, and Jackson is not entitled to habeas relief.
Consequently, we deny Jackson’s petition- for writ of habeas corpus and request for a new appeal.
CONCLUSION
Based on the foregoing, we affirm the denial of relief by the postconviction court, and deny the habeas petition.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY J., concurs in result.

. Huffv. State, 622 So.2d 982 (Fla.1993).

. To the extent that this Court has ruled on issues with regard to victim survivors, it has been in the context of victim impact evidence, not victim outreach activities, and whether trial or appellate counsel was ineffective with regard to the failure to object to the admission of such evidence or the trial court's consideration of it. See, e.g., Belcher v. State, 961 So.2d 239, 257 (Fla.2007) (holding appellate counsel was not ineffective for forgoing a claim disputing the admission of victim impact evidence because it had no merit); Walls v. State, 926 So.2d 1156, 1179 (Fla.2006) (holding that letters from the victims’ family constituted improper victim impact statements, but appellate counsel was not ineffective for failing to raise a claim because the jury never saw the letters and thus the claim was without merit).

. Jackson also refers to extensive portions of the commentary section of the ABA Guidelines, which discusses how plea negotiations in death penalty cases often involve contact with a victim’s family members. See ABA Guidelines, at *94-96 (rev. ed. 2003). The ABA Guidelines do not appear to address an alleged duty on behalf of counsel to pursue victim outreach.

. "Alan" is Jackson’s co-defendant, Alan Wade.

. Jackson, who had been raised by his grandmother since infancy, refers to his grandmother as his mother.

. Jackson references the decision of the United States Supreme Court in Payne v. Tennessee, 501 U.S. 808, 826, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In his brief, Jackson alleges that Payne does not permit the admission of grief and mourning testimony like that which Revis Sumner provided. However, this allegation contradicts the opinion of the Supreme Court, which held that the victim impact statement provided at sentencing in that case was admissible and not automatically barred by the Eighth Amendment. Payne, 501 U.S. at 827, 111 S.Ct. 2597. Amongst the testimony that the Payne Court held admissible was a statement by the grandmother of the child-survivor of the murderous episode in which she conveyed "that the child misses his mother and baby sister”; the Court described this statement as "illustrating] quite poignantly some of the harm that Payne's killing had caused.” See id. at 826, 111 S.Ct. 2597.